# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MERCEDES LAPORCHA KEMP,

      Defendant-Appellant.

UNPUBLISHED
December 2, 2014

No. 316254
Ingham Circuit Court
LC No. 12-000694-FC

Before: OWENS, P.J., and MARKEY and SERVITTO, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of second-degree murder, MCL 750.317, torture, MCL 750.85, and first-degree child abuse, MCL 750.136b(2). The trial court sentenced defendant to concurrent terms of imprisonment of 25 to 50 years for the murder conviction, 15 to 30 years for the torture conviction, and seven years and 11 months to 15 years for the child-abuse conviction. Defendant appeals by right, challenging the sufficiency of the evidence. We affirm.

## I. FACTS

This case arises from the death of defendant's two-year-old son as the result of multiple blunt-force injuries inflicted upon him. The prosecution's theory of the case was that defendant and her boyfriend, Marcus Hill,[1] isolated themselves and the child from friends, family, law enforcement, and others, and engaged in an escalating pattern of beatings and other excessive physical discipline out of frustrations over efforts to toilet train the child. The prosecution proceeded on the basis of alternate theories of defendant's direct participation in the violence, and of her aiding and abetting Hill in such violence.

Defendant brought her child to the hospital early in the afternoon of April 30, 2013, but he had no vital signs and abnormally low body temperature and blood sugar levels. Emergency medical providers' intensive attempts to resuscitate the boy were not successful. Defendant

---

[1] Hill was separately tried and convicted of first-degree murder, first-degree child abuse and torture and received a sentence of nonparolable life imprisonment for the murder conviction, concurrent with lesser sentences for the other convictions.

-1-

offered friends, family members, hospital employees, and police investigators inconsistent accounts of how she spent the several hours ahead of that hospital visit, but she consistently maintained that the victim was exclusively in Hill's care when the fatal injuries were inflicted. Defendant's demeanor as she brought her son to the hospital and attended the resuscitation efforts was described as stunned and sad, yet calm. She was not at all frantic or hysterical.

The autopsy brought to light that the child had suffered many injuries over time. External injuries included bruising on the eyes, ears, forehead, back, chest, buttocks, arms, and thighs, and abrasions on the chin and lip, all of which were consistent with applications of blunt force. One of the youngster's injuries was of a size and shape that suggested a cigarette burn. Another was damage to the skin at the base of the boy's penis, which expert testimony described as typical of abuse relating to toilet-training. Internal injuries included full thickness bleeding on the scalp, hemorrhaging into the neck, and bleeding into the lungs, and a liver broken into two or three pieces as the result of an extremely forceful blow to the abdomen. The death was classified as a homicide.

Defendant's friends and relatives testified that she became increasingly isolated from them after she began her intimate relationship with Hill in the summer of 2011. The testimony included that defendant had previously disciplined her children mainly through verbal admonishments and "time outs," only occasionally resorted to spanking by hand, but then increasingly acquiesced in and inflicted the harsher physical punishments Hill favored, including whipping the children with a belt. The testimony also included that defendant refused to open the door at various times when relatives, police officers, or workers from Child Protection Services came to her apartment to investigate or offer assistance. Defendant's intimates testified that defendant never complained to them of any abusive behavior on Hill's part.

Defendant testified that Hill began living with her late in 2011 and routinely physically abused her, and increasingly imposed restrictions on where she could go, with whom she could communicate, and who was allowed into the apartment. Of particular concern was that her children were still prone to toilet-training incidents, over which Hill was very impatient and prone to respond with excessive corporal punishment. Defendant admitted that she once tried to cause Hill to think she had struck her daughter with a belt over a toilet-training incident in order to placate him and also that Hill insisted that her son spend long periods "on the potty," and that she acquiesced in this in hopes of protecting the child from "a whooping."

Asked about April 30, 2012, defendant testified that Hill sent her out of the apartment to try to borrow a telephone charger from neighbors, once at about 7:00 that morning, then again a few hours later. According to defendant, before leaving on the second round of those errands, she checked on the children and found them still asleep. But when she returned from what was another failed attempt to obtain a charger, she instinctively felt the need to check on her son. She found him "trying to lean on the potty trying to catch his balance." Defendant continued that she asked Hill what he had done to the child, but that Hill responded with verbal and physical abuse. Defendant testified that Hill left the immediate area after a few minutes, upon which she tried unsuccessfully to give the boy water and induce him to talk. Hill, however, returned with a knife and admonished her not to leave the apartment or let anyone in.

Defendant continued that she did not run out of the house while Hill was still present because she feared he would "[k]ill all of us." Instead, she retrieved a first aid kit, looked for something in it that might be of use, and tried to administer some anti-nausea medicine which the child did not swallow. After perhaps 45 minutes, according to defendant, she sensed that Hill had left the house; she looked through the closets to make sure that he was gone, then went to a neighboring couple's home and asked for a telephone. She then accepted an offer of a ride to the hospital from one of them.

On cross-examination, defendant admitted expecting that her son would continue to have toilet-training accidents which would in turn draw continuing physical abuse from Hill, who had struck the child with a belt and inflicted injuries resulting in bruises, black eyes, and scars. She agreed that she understood Hill to be a violent man and tried to hide those violent tendencies from family, friends, CPS, and the police. She further agreed that she had allowed Hill to stay in her home even though he was not party to the lease and was deemed a trespasser by the apartment complex. Asked if she had "outright lied" to those who had come to her residence to try to offer some protection from Hill, defendant answered in the affirmative. Defendant additionally admitted that Hill was a drug dealer and chronic drug user, but that she had told no one about those things and continued to leave her children in Hill's care. Asked if she did these things on her own volition, defendant answered in the affirmative.

As cross-examination continued, defendant testified that she had bathed the victim perhaps two days before he died and had noticed marks on his arms and legs, bruises on his left arm, injuries to his back, eyes, and ears, and "like the rash mark" on the boy's penis, but then lied to a police detective who had asked about what injuries the child had before he died. Defendant added that the injuries her son had accumulated by the night before he died included a scabbed mark on the neck that might be a cigarette burn but that she did not know how he had acquired it.

Defendant further admitted that she had not taken the child to the doctor since December 2011, even though the child had sustained injuries of the sort she had just described, and defendant had no way to determine if the child were seriously hurt.

Defendant was charged with, and her jury instructed on, first-degree felony murder, first-degree child abuse, and torture. The trial court further instructed the jury on aiding and abetting in connection with all charges and on second-degree murder as an alternative to first-degree murder. As noted, the jury found defendant guilty of second-degree murder, first-degree child abuse, and torture.

## II.  STANDARD OF REVIEW

To ascertain if sufficient evidence supports a criminal conviction, this Court reviews de novo the trial evidence in a light most favorable to the prosecution and determines whether a rational trier of fact could find that all elements of the crime were proved beyond a reasonable doubt. *People v Herndon*, 246 Mich App 371, 415; 633 NW2d 376 (2001).

## III.  AIDING AND ABETTING

Although, as noted, the prosecution alleged that defendant was guilty of torture, child abuse, and murder as both a principal and as an aider and abettor, we identify the latter theory as the best-supported one, and so we will confine our analysis to it.

Regarding aiding and abetting criminal conduct, MCL 767.39 provides: "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense."

A conviction of aiding and abetting requires proof of the following elements: (1) the underlying crime was committed by either the defendant or some other person, (2) the defendant performed acts or gave encouragement that aided and assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time of giving aid or encouragement. [*People v Smielewski*, 235 Mich App 196, 207; 596 NW2d 636 (1999).]

"Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to show that a person is an aider and abettor." *People v Wilson*, 196 Mich App 604, 614; 493 NW2d 471 (1992). Nonetheless, any advice, aid, or encouragement, however slight, if effective, is sufficient to establish guilt on an aiding and abetting theory. *People v Washburn*, 285 Mich 119, 126; 280 NW 132 (1938). Aiding and abetting thus involves all forms of assistance rendered to the perpetrator of a crime, including all words or actions that might encourage or support the commission of the crime. *People v Palmer*, 392 Mich 370, 378; 220 NW2d 393 (1974).

The intent element for purposes of aiding and abetting may be satisfied by proof that the defendant had a specific intent to commit the crime, that the defendant had knowledge of the principal's intent to commit the crime, or that the criminal act committed by the principal was an incidental consequence that might reasonably have been expected to result as a natural and probable consequence of the intended wrong. *People v Robinson*, 475 Mich 1, 6-7, 9; 715 NW2d 44 (2006). "An actor's intent may be inferred from all of the facts and circumstances, and because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v Fetterley*, 229 Mich App 511, 517-518; 583 NW2d 199 (1998).

IV. ANALYSIS

A. TORTURE

A person commits torture when that person, "with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody." MCL 750.85(1).

In this case, the evidence is abundant that over an extended time, the victim suffered grave physical abuse, the results of which included much external bruising, internal bleeding, the fracturing of the liver, and culminating in the child's death from multiple blunt force injuries. Also evidence was presented at trial that once Marcus Hill moved in with defendant, contact with

outsiders became rare; Hill and defendant had exclusive care and custody of the victim, which excludes others as possible causes of those injuries.

Again, any amount of advice, aid, or encouragement that actually operates in furtherance of another's criminal conduct constitutes aiding and abetting. *Palmer*, 392 Mich at 378; *Washburn*, 285 Mich at 126. In this case, the evidence raises the inference that Hill was the primary abuser, but it also implicates defendant as doing more than passively observing.

The father of defendant's children testified that before associating with Hill defendant had resorted to physical discipline no greater than spanking with the hand, as opposed to "whooping" with an object, but with Hill in the household, defendant readily followed Hill's directive that she "whoop" the victim for toilet-training accidents. Defendant's close friend testified that she saw defendant calmly striking the victim's sister with a belt two or three times on Hill's orders over a toilet-training incident, and that defendant had admitted that she "did whoop" the victim's sister over another such incident. Defendant herself admitted that she once tried to protect the victim from Hill's striking her with a belt, not by objecting to such discipline, but by trying to cause Hill to think she herself had taken that action. Such conduct could only have encouraged Hill in his escalation of physical punishments.

But defendant's role in the violence Hill inflicted went beyond encouraging him through acquiescence. Defendant testified that Hill was physically violent and abusive toward her since early in their relationship and that he soon extended such treatment to the children. But rather than distance herself from Hill to protect herself and the children, she aided him in his campaign of physical abuse by allowing him to continue to reside with her despite being on her apartment complex's no-trespass list and declining offers of assistance from her mother, the police, and CPS. Defendant admitted that she understood Hill struck the victim with a belt and inflicted injuries resulting in bruises, black eyes, and scars, and also that she had expected that the boy would continue to have toilet-training accidents which would result in continuing physical abuse from Hill. She further admitted that she had noticed some serious injuries on the victim shortly before he died, but defendant stopped taking the child to the doctor and had no way to know how seriously the child was hurt. Defendant also admitted that it was her own choice to have Hill live with her and to leave her children in his care even though she fully expected Hill to continue to inflict excessive physical punishments.

This evidence would fully support a rational trier of fact's concluding that defendant was very much an aider and abettor of Hill's intentional infliction of great bodily injury or severe mental pain or suffering upon the victim, a person within his custody, with the intent to cause cruel or extreme physical or mental pain and suffering. MCL 750.85(1). Defendant's challenge to the sufficiency of the evidence to support her conviction of torture must fail.

## B. FIRST-DEGREE CHILD ABUSE

First-degree child abuse occurs where a "person knowingly or intentionally causes serious physical or serious mental harm to a child." MCL 750.136b(2). Defendant emphasizes the intent element and argues that the evidence, at best, might support a conviction of second-degree child abuse, MCL 750.136b(3).

A conviction of first-degree child abuse requires proof that the defendant intended to commit the act that resulted in harm, and in doing so "intended to cause serious physical . . . harm [to the child] . . . or that she knew that serious . . . physical harm would be caused" to the child. *People v Maynor*, 470 Mich 289, 297; 683 NW2d 565 (2004). Given that defendant was prosecuted on an aiding and abetting theory, our inquiry is whether the evidence in this case was sufficient to persuade a rational jury that defendant assisted or encouraged Hill in abusing the victim with knowledge that Hill was himself acting with the intent to cause serious physical harm or the knowledge that it would result. See *Smielewski*, 235 Mich App at 207.

Again, defendant admitted that she knew Hill was a violent abuser who inflicted excessive physical punishments, yet she chose to leave her children in his care where they were vulnerable to such violence and abuse. Defendant further admitted to noticing many signs of physical trauma on the victim's body shortly before he died and also that she had stopped taking the child to the doctor after December 2011, so she did not know if the injuries he was accumulating left him seriously hurt. The evidence thus supported the conclusion that defendant entrusted the victim to Hill with every expectation that he would continue his pattern of intentionally inflicting excessive corporal punishments on the child resulting in serious physical harm. MCL 750.136b(2); *Maynor*, 470 Mich at 296; *Smielewski*, 235 Mich App at 207. Accordingly, the evidence was sufficient to support defendant's conviction of first-degree child abuse.

## C. SECOND-DEGREE MURDER

"The elements of second-degree murder are: (1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). In attacking the sufficiency of the evidence to support her conviction of second-degree murder, defendant again focuses on the intent element.

Malice for purposes of second-degree murder is "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* at 464. Accordingly, actual intent to kill or harm need not be proved, only that the defendant intentionally acted "in obvious disregard of life-endangering consequences." *Id*. at 466.

As discussed above, defendant repeatedly left the victim at the abusive hands of Hill with every reasonable expectation that doing so would result in his continuing to abuse the child and that all the while she endeavored to hide that violence from the outside world and thwart those who came to the house out of concern for her and the children. The evidentiary record thus supported the conclusion that defendant aided and abetted Hill in willful disregard of the natural tendency of Hill's behavior to cause at least great bodily harm. See *Robinson*, 475 Mich at 6-7; *Goecke*, 457 Mich at 463-464.

Further, an actor's behavior after a crime has been committed may be indicative of that actor's intent in connection with that crime. See *People v Johnson*, 460 Mich 720, 733; 597 NW2d 73 (1999). In this case, the testimony consistently presented defendant as sad, moody, and deliberate as she brought her lifeless son to the hospital, not at all frantic or desperate. Defendant's display of sad acceptance in that tragic situation revealed that she was not surprised

that Hill's long pattern of physically abusing her child had reached its natural and probable extreme.  See *Robinson*, 475 Mich at 6-7.

For these reasons, we must reject defendant's claim that the prosecution failed to present sufficient evidence to satisfy the intent element of second-degree murder.

We affirm.

/s/ Donald S. Owens
/s/ Jane E. Markey
/s/ Deborah A. Servitto