# Court of Appeals, State of Michigan

# ORDER

People of MI v Rufus Rudie Thomas

Docket No.    337760

LC No.        16-005511-01-FC

Stephen L. Borrello
Presiding Judge

Michael J. Kelly

Mark T. Boonstra
Judges

The Court orders that the motion for reconsideration is GRANTED, and this Court's opinion issued July 26, 2018 is hereby VACATED.  A new opinion is attached to this order.

/s/ Stephen L. Borrello

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

August 30, 2018
Date

Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RUFUS RUDIE THOMAS, also known as
RUFUS RUDIE LEWIS, JR., also known as
KEION HEJOLE FERGUSON,

        Defendant-Appellant.

UNPUBLISHED
August 30, 2018

No. 337760
Wayne Circuit Court
LC No. 16-005511-01-FC

Before: BORRELLO, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to commit murder (AWIM), MCL 750.83, two counts of being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and two counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of life in prison for the first-degree murder conviction, 30 to 60 years' imprisonment for the AWIM conviction, and 5 to 60 years' imprisonment for each felon-in-possession conviction, as well as concurrent two-year terms of imprisonment for the felony-firearm convictions that were to be served consecutively to defendant's sentences on the other convictions. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Defendant's convictions arise from two separate shootings of employees of Total Relief Dispensary, a medical marijuana dispensary located at 19602 Grand River Avenue in Detroit. The victim of the first shooting, which occurred outside of the dispensary on October 6, 2015, was Joshua Colson. The victim of the second shooting, which occurred in the vicinity of the dispensary on October 21, 2015, was Francis Semma. The prosecution's theory was that defendant was involved in the shootings, the second of which resulted in the death of Semma, as a mercenary. The prosecution presented evidence connecting defendant to vehicles and weapons used in each shooting. The prosecution further presented photographs, videos, and text messages showing a connection between defendant and the crimes, as well as evidence that defendant's cell phone was in the vicinity of the shootings around the time that they occurred.

-1-

Jonathan Rowsey testified that at approximately 10:00 a.m. on October 6, 2016, he was standing outside his automobile collision shop, Advance Expert Collision, which is located across the street from Total Relief Dispensary. He saw a silver station wagon,[1] with three men inside, parked in front of Aunt Betty's Restaurant, which is located next to Advance Expert Collision. Colson, who was a manager at Total Relief Dispensary, testified that he was at the dispensary that morning. At approximately 10:00 a.m., he went outside to "smoke a cigarette or get fresh air." Rowsey testified that as Colson was walking back to the dispensary from his vehicle, the silver station wagon "hit a U-turn and stopped in front of the dispensary and started shooting." According to Rowsey, the gunshots were fired from the passenger side of the silver station wagon. Colson testified that he saw a silver four-door vehicle approach and stop in the middle of the street. He then "felt and heard" gunshots, and he was shot multiple times. Colson saw at least three men in the vehicle. John Williams, the security guard at the dispensary, used Colson's nine-millimeter caliber gun to fire back from inside the dispensary, shooting through the exterior window of the dispensary at the vehicle. Williams also described the vehicle during his trial testimony as a gray station wagon, and he believed that the shots came from the rear passenger seat. Rowsey testified that after the shooting, the silver vehicle drove away down Grand River Avenue and turned on Evergreen. None of the witnesses could identify any of the individuals inside the vehicle. The surveillance video from the interior and exterior of Total Relief Dispensary that was recorded during the time of the incident was played for the jury during trial. As a result of the shooting, Colson suffered 16 gunshot wounds and was hospitalized for over two months.

At the scene, police found a copper jacket fragment, 13 .357 caliber SIG shell casings, four .40 caliber shell casings, and a .40 caliber live round on Grand River Avenue in front of the dispensary. Additionally, 10 nine-millimeter casings were recovered from the lobby of the dispensary.

Colson testified that when the dispensary first opened, the co-owners were Dicko Dekho and Patrick George, who was Colson's father-in-law. According to Colson, Dekho went to jail at some point and became upset that he "wasn't getting his share" of the dispensary business while he was in jail. Colson was never threatened over that issue, and he was never directly threatened by Dekho. However, Colson testified that Dekho was "the only one that had a problem with the place" and that it "was like a war zone with Dekho." Colson further explained that there was a lot of "tension" between Dekho and the new owners of the dispensary. Colson testified that "there was a[n] incident where, um, we had thought that someone had threw a firebomb, like a Molotov cocktail at the window at night because there was a flash and a burnt spot." Colson also indicated that Semma had been introduced to him as a friend of George's family. Additionally, Colson indicated that he had been threatened on multiple occasions by Norman Yono at the dispensary.[2] Yono had threatened to seriously injure Colson because Colson was supplying pills to Yono's son, and one such incident had occurred less than a week before Colson was shot. However, after Colson was shot, Yono also visited him and provided assistance for him.

---

[1] Rowsey identified this vehicle as a "silver Volkswagen station wagon."
[2] The precise nature of Yono's relationship to the dispensary operations was not clear from the trial testimony.

At approximately 9:20 p.m. on October 21, 2015, Semma, who also worked at Total Relief Dispensary, was found dead inside his 2015 GMC Sierra pickup truck at the intersection of Grand River Avenue and Burt Road, approximately .7 miles away from the dispensary. Semma's wife testified that Semma had just started working at Total Relief Dispensary the previous day. Detroit Police Officer Christopher Bush testified that when he arrived on the scene that night, he saw the pickup truck sitting at the light with "several gunshot holes to the driver's side of the vehicle." Semma was the only person inside the pickup truck, and he was unresponsive when Bush arrived. Semma was in the driver's seat with his foot on the brake, and the truck was still running and in drive. He had five gunshot wounds: one to his left cheek, two to his left shoulder, one to his left arm, and one to his back. At the scene, police found 10 .223 caliber shell casings, which came from an assault rifle; eight .357 SIG shell casings; and a fired bullet.

During the course of investigating the shootings, Michigan State Police Detective Sergeant Tracey Walton and her team of investigating officers retrieved surveillance video from businesses in the area. According to testimony at trial,[3] and our review of surveillance video from Big Mama's Kitchen that was recorded on October 6, 2015, between approximately 10:00 a.m. and 10:15 a.m., showed traffic traveling on Grand River Avenue. A silver[4] station wagon was depicted in this surveillance video, and Rowsey testified that this silver station wagon was the same one that he saw during the shooting at the dispensary. Officers were able to identify the silver station wagon that was depicted in the surveillance video as a Volvo V60, and as a result, Walton and her team checked for reports of stolen Volvos. They discovered that a Volvo had been reported stolen from 12201 Morang by Ashira Marshall.

Marshall testified that she knew defendant through her boyfriend, Daveon Lamb, and had seen defendant frequently at 5444 Holcomb, which was where Mikieta Lamb lived. Mikieta was a friend of defendant's, and many people would hang out and spend the night at the house on Holcomb. On October 1, 2015, Marshall rented a silver 2015 Volvo V60 station wagon, and she brought the Volvo to the house on Holcomb on October 4 or 5, 2015. She spent the night there on October 5, 2015. Defendant, Mikieta, and John Lamb, who was Mikieta's brother, were also there that night. Marshall testified that defendant left at some point and never returned to the house that night. She realized the Volvo was gone at approximately 2:00 a.m. or 3:00 a.m. Marshall called defendant's cell phone, but he did not answer. Marshall went to the police the next day to report the vehicle stolen, but she reported that the vehicle was stolen from 12201 Morang rather than from the house on Holcomb because the Holcomb house was a "squat house" that was not owned or rented by anyone. 12201 Morang was the address of the apartment building where Donna Lamb, who was the mother of both Mikieta and John, lived.

---

[3] In our prior ruling we noted that this Court had requested the surveillance video from the parties and a due date was given. When the Court did not receive the surveillance video by the due date, an opinion was issued. Thereafter, both parties moved for reconsideration, contending that it was essential for the Court to review the video. Hence, this Court granted reconsideration for the sole purpose of reviewing the video. Following review of the video, the Court finds that the video does not alter any of its prior analysis or conclusions.

[4] At some points during trial, this vehicle was also referred to as being gray in color.

Walton's investigation also involved retrieving surveillance video recorded by area businesses on the night of October 21, 2015. There was testimony that surveillance video from Advance Expert Collision, which was recorded at approximately 8:10 p.m. on October 21, 2015, showed a silver SUV pulling up to the collision shop without its headlights on. Additionally, according to the testimony, and our review of further surveillance video from Big Mama's Kitchen and Advance Expert Collision that was recorded that night at approximately 9:10 p.m. a silver SUV can be seen, after having remained parked near the collision shop during the previous hour, turning its headlights on and driving away about one or two seconds after another vehicle that had been parked started driving. There was further testimony that additional surveillance video was retrieved from Grand River Collision on Grand River Avenue, which showed Semma's black pickup truck driving down Grand River Avenue at approximately 9:12 p.m that night, followed by a silver or light-colored SUV. Walton testified that this silver SUV was the same one she saw parked for an hour in the Advance Expert Collision surveillance video. According to Walton, the silver SUV shown in the surveillance videos was identified as a Chevrolet Trailblazer SS, and officers checked for reports of stolen Trailblazers. It was discovered that on October 29, 2015, defendant had been arrested driving a stolen Trailblazer SS.

Detroit Police Officer William Tatum testified that on October 29, 2015, he had pulled over a Trailblazer SS driven by defendant in order to conduct a traffic stop. Defendant drove away as Tatum was approaching the Trailblazer on foot. The Trailblazer stopped when it crashed into another vehicle, and defendant got out of the Trailblazer and ran. Defendant was apprehended and arrested for possession of a stolen motor vehicle and fleeing and eluding. Tatum found a cell phone inside the Trailblazer on the floor of the driver's side, and he testified that when the cell phone rang or vibrated on the scene, defendant said, "That's my phone." The Trailblazer was impounded. When it was processed, two McDonald's receipts were found on the floor, dated October 22, 2015, and October 28, 2015. There was also a cell phone in the passenger's seat[5] and a water bottle in the front center console. At some point following defendant's arrest, he was released on bail.

Shariva Brown, defendant's former girlfriend, testified that she dated defendant from June to November 2015, and she had seen him driving a Trailblazer SS in October, "maybe a week before he got arrested."

On January 3, 2016, police recovered a firearm believed to have been used in the October 6, 2015 shooting. Detroit Police Officer Thomas Houston testified that while on patrol at approximately 12:15 a.m. on January 3, 2016, he passed 12201 Morang and saw three men standing on the grass who took off running toward the apartment complex as Houston's vehicle drove past. Houston and his partner stopped, got out of their vehicle, and chased the three men to the doorway of one of the apartment units. They detained all three men, who were subsequently identified as John Lamb, Joseph Lamb, and defendant. That night, however, defendant had claimed that his name was Keyito[6] Keyonte Ferguson. Donna, who was also the mother of Joseph, testified that she was asleep in her apartment that night when defendant "kicked in" her door. She got up and saw defendant, John, Joseph. Houston testified that he and

---

[5] It appears that this was a different cell phone than the one that was confiscated by Tatum on the scene.

[6] This was the spelling given by Houston during his trial testimony.

his partner also found a .40 caliber handgun, which contained 19 live rounds, on the grass in the area where John, Joseph, and defendant had been running. The officers did not arrest John, Joseph, or defendant that night because neither Houston nor his partner saw how the handgun had come to be on the grass. Donna testified that after the police left her apartment, she asked defendant why he kicked her door in, and he said that he had to "throw a gun." Michigan State Police Detective Lieutenant Brian Bergeron, testifying as an expert in firearm and tool mark identification, opined that the .40 caliber shell casings recovered from the scene of the October 6, 2015 shooting were fired by the .40 caliber handgun recovered outside 12201 Morang on January 3, 2016.

On January 30, 2016, police recovered another firearm believed to have been used in the October 6, 2015 shooting. Detroit Police Officer Jonathan Gardner testified that he was dispatched to 13224 Monica in response to a 911 call indicating that there were three or four men at the location who were armed with guns and dressed completely in black. As Gardner and his partner approached the address in their police vehicle, Gardner saw a red vehicle, later identified as a Mazda, pull out of a driveway and travel toward the police vehicle. There were four men inside red Mazda, wearing all black. After Gardner's partner did a U-turn, the red Mazda pulled into a driveway, and the four occupants got out of the vehicle. According to Gardner, the front passenger threw a handgun back into the red Mazda and ran behind 12673 Monica along with another passenger, where Gardner and his partner apprehended them both. The front passenger was later identified as Rayquan Lamb, and the other passenger was later identified as James Hampton. Gardner also apprehended the driver of the vehicle, Christian Brown, and confiscated Christian's cell phone. Christian was Shariva's brother. The gun tossed by Rayquan and recovered from the red Mazda that night was a black and silver Glock 31, .357 caliber, extended magazine, which was loaded with 22 live rounds. Bergeron opined that the .357 caliber SIG shell casings recovered from the scene of the October 6, 2015 shooting were fired from the Glock handgun found in the red Mazda. He further opined that the .357 SIG caliber shell casings recovered from the scene of the October 21, 2015 shooting did not come from this Glock handgun.

Gardner testified that rental paperwork was found in the glove compartment of the red Mazda, indicating that the vehicle had been rented by Demetra Ollison. When Ollison was called, she indicated that she had been carjacked. Ollison, a friend of defendant's, testified that she rented a red Mazda on January 29, 2016. Defendant went with Ollison to complete the rental transaction, and he gave her cash to pay for the rental. However, Ollision rented the red Mazda in her name and paid with her credit card. Defendant then took the car that night. At some point on January 30, 2016, defendant called Ollison and told her to report the red Mazda as stolen. Ollison called the police and reported the red Mazda stolen, and she told police that three individuals took it from her. At defendant's trial, Ollison admitted that this story was a lie.

On February 3, 2016, police executed a search warrant at 5444 Holcomb, where Mikieta lived. Police recovered three guns, including a 5.56 x 45 millimeter Nato round caliber rifle, which is an assault rifle similar in style to an M4 or AR-15. Bergeron opined that shell casings recovered from the scene of the October 21, 2015 shooting had been fired by this assault rifle.

Amanda Crooker, a latent print examiner for the Michigan State Police, testified that she examined the McDonald's receipts and water bottle that were collected from the Trailblazer SS

for the presence of latent prints. Crooker concluded that two fingerprints that she collected from the October 22, 2015 McDonald's receipt and one fingerprint that she collected from the water bottle matched fingerprints on a fingerprint card for "Keon Ferguson," which was already on file. Crooker was also asked to "do a card-to-card comparison with three other fingerprint cards that were submitted to the lab." These fingerprint cards bore the names "Rufus Rudie Thomas," "Keyitoe Ferguson," and "Rufus Thomas." Crooker concluded that the fingerprints on the fingerprint cards were all made by the same individual.

Michigan State Police Sergeant David Boike examined the cell phone confiscated by Tatum during the October 29, 2015 incident involving defendant and the Trailblazer SS. A Gmail account with the username "ThomasRudie4@gmail.com" was found on the phone, as well as an Instagram account with the username "thereal_ruger_rudie_badazz." Ollison testified that she also knew defendant as "Rudie Ruger," which was the name used by defendant when performing as a rapper. Marshall also testified that she called defendant "Rudie." Boike testified that this cell phone contained an outgoing text message[7] sent on October 1, 2015, that said, "Hey this Rudie. You remember me?" Another text exchange[8] on October 1, 2015, began with an incoming text message that said, "Hi, who is this?" The user of the phone associated with defendant responded, "Rudie. Who this?"

Boike testified about other text messages sent from the cell phone associated with defendant. On October 4, 2015, there was a text message conversation with "LOML MY" about getting money for food and in which the user of the phone wrote, "I swear baby I'm really trying to get us some serious paper." On October 4, 2015, another outgoing message to "Ralf" said, "We can do that situation ourselves, Bro', if yo' girl gonna be transportation and me and you will split the if [sic] you still down, Bro'. We need this shit Bro'." Another October 4 outgoing message to "Bro' Big" said, "Need to use that M4, Bro'. I'mma just pull up on them. Shit too structured talk to them in front of that place." Another outgoing message to Bro' Big that day said, "Simple quick and easy." During the course of the investigation of the shootings, it was determined that Bro' Big referred to John Lamb and that the telephone number associated with Bro' Big was in the name of John's girlfriend.

According to Boike, the cell phone associated with defendant also contained a list of contacts, one of which was "Murder C." The phone number for Murder C was the same phone number that belonged to the cell phone that was confiscated from Christian during the January 30, 2016 incident involving the red Mazda.

Boike's examination of the phone associated with defendant revealed that there were a total of three incoming calls from Murder C, 20 outgoing calls to Murder C, and one missed call from Murder C. On October 21, 2015, there was an incoming call from Murder C at 2:06 p.m. and four outgoing calls to Murder C. On October 22, 2015, there were two outgoing calls to Murder C.

Boike's examination also revealed that there were a total of 23 text messages between this cell phone and Murder C. On October 2, 2015, an incoming text message from Murder C

---

[7] The identity of the recipient of this message is not relevant to the issues raised on appeal.
[8] The other party to this text message exchange was not identified.

said, "Are we still on tht [sic] mission?" In response, an outgoing message from the user of the phone said, "Hell, yeah." Boike testified that there was another string of text messages between the user of the cell phone associated with defendant and Murder C on October 5, 2015. An outgoing message to Murder C said, "Bro' wake me up at eight in the morning. We up at it early." Murder C replied, "Bet." Murder C later texted, "Get suited, Bro'. It's about to be eight." An outgoing message then said, "WYA,"[9] and Murder C replied, "Upstairs." There was also an outgoing message to Bro' Big saying, "WYA." Additionally, on October 6, 2015, an outgoing message sent to Bro' Big at 10:27 a.m. said, "It was business . . . now it's personal."[10]

Boike's examination of this cell phone further revealed that there was a YouTube search for a 2015 Volvo V60 at 2:22 p.m. on October 6, 2015, and there was a web search for a 2015 Volvo V60 on October 26, 2015. There was also a web search on October 6, 2015, for "How to remove a GPS disabler from a vehicle." On October 13, 2015, there was a YouTube search for a "Procharger Trailblazer SS, AWD, donut burnout." On October 14, 2015, the web history showed a news article titled, "One person shot at medical marijuana dispensary on Detroit's west side." Similarly titled articles were accessed on October 16, 2015, and October 18, 2015, and there were more searches for news articles conducted on October 22, 2015.

Boike was also able to recover photographs from the cell phone attributed to defendant. A photograph on the phone that was dated October 6, 2015, at 9:47 a.m., showed what was identified at trial as the inside of a 2015 Volvo V60 by Michael Path, who testified as an expert in Volvos and Volvo features. There were also photographs recovered from this cell phone that showed defendant and that were taken on various dates throughout October 2015. An October 26, 2015 photograph from the previously mentioned Instagram account on the phone showed a large bundle of United States currency. A photograph from the same Instagram account, dated October 23, 2015, showed a steering wheel with an "SS" in the center and a cell phone on someone's lap. Another Instagram photograph from that date said "#shooters" and showed Christian and another person who was wearing a mask.

Special Agent George Rienerth of the Federal Bureau of Investigation (FBI) examined the cell phone recovered from Christian. On this cell phone was an October 22, 2015 text message exchange with an incoming message stating, "Are you gonna go pick them up or what, Christian?" The outgoing response stated, "Yeah, Dog." This cell phone also contained text message exchanges with the cell phone attributed to defendant that corresponded to those previously described between that cell phone and Murder C. Additionally, the cell phone attributed to Christian contained video taken on the afternoon of October 21, 2015, that showed an "SS" emblem on a steering wheel and a storefront with the address "19602," which was the address of Total Relief Dispensary. Special Agent Kevin Doyle of the FBI testified that a still photograph from video that was retrieved from the cell phone associated with Christian showed Total Relief Dispensary and a black GMC pickup truck. Another still photograph from video on this phone showed defendant and Total Relief Dispensary. These particular videos were also created on the afternoon of October 21, 2015.

---

[9] "WYA" commonly means "where you at?"

[10] It appears from the trial testimony that the ellipsis was part of the original text message.

Detroit Police Lieutenant Michael McGinnis was qualified as an expert in call detail record analysis and cell site mapping. McGinnis generated a call report and cell site maps for October 6, 2015, with respect to the cell phone associated with defendant. The records showed that this cell phone made calls that day at approximately 9:37 a.m. and 9:52 a.m. from the area in which Total Relief Dispensary was located. The records also showed that approximately 15 minutes after 911 had been called with respect to the shooting, the cell phone associated with defendant made calls from which McGinnis could determine that the phone was in the area of 5444 Holcomb. McGinnis also generated a call report and cell site maps for October 21, 2015, which showed that at 9:13 p.m., approximately nine minutes before the 911 call related to the shooting, defendant's phone was in the area of Grand River Avenue near the scene of the shooting.[11] Approximately eight minutes after the 911 call, the cell phone associated with defendant was in the area of 5444 Holcomb. McGinnis also testified that there were seven exchanges between this cell phone and Marshall's telephone number on October 5, 2015, and that there were five exchanges between these numbers on October 6, 2015. The next exchange between these two telephone numbers occurred on October 21, 2015.

Following final jury instructions, which included an aiding-and-abetting instruction, defendant was convicted and sentenced as previously stated. This appeal followed.

## II. SEVERANCE OF CHARGES

Defendant first argues that the trial court erred by denying his pretrial motion to sever the AWIM and accompanying firearm charges that stemmed from the October 6, 2015 incident from the murder and accompanying firearms charges that stemmed from the October 21, 2015 incident. Specifically, defendant argues that the trial court was required to grant his severance motion because the AWIM offense was not "related" to the murder offense for purposes of MCR 6.120(B)(1).

In the trial court, defendant filed a pretrial motion for severance on January 25, 2017, in which defendant argued that the two sets of charges were unrelated because the acts occurred on different days and involved different victims. Defendant further argued that it was unlikely that the testimony concerning the charges would overlap and that severance was appropriate to promote fairness.

At a hearing on January 30, 2017, defendant maintained that severance was required under MCR 6.120(C) because there was little or no evidence to support the prosecution's claim that the incidents were related. The prosecution argued that the charges involved both a series of connected acts and a series of acts constituting a common scheme or plan because they occurred two weeks apart, they both occurred at or near the dispensary, both victims were employees of the dispensary, each victim was shot either outside the dispensary or after leaving the dispensary, there was evidence of a business dispute at the dispensary that established a common motive, and

---

[11] According to McGinnis, the general service area of cell towers in the Detroit Metro area is approximately 1 mile from the tower. Each tower covers a 360-degree area, which is divided into "sectors." McGinnis testified that he was able to determine the approximate location of the cell phone at a given time by reference to the cell tower sector that serviced a communication exchange involving the cell phone at that time.

there was evidence that the participants in the shooting surveilled the location before the shootings. The trial court denied the motion, ruling that the charges were related and that severance was not required.

Under MCR 6.120, "decisions regarding joint or severed trials for related charges lie firmly within the discretion of trial courts." *People v Breidenbach*, 489 Mich 1, 14; 798 NW2d 738 (2011); see also *People v Gaines*, 306 Mich App 289, 304; 856 NW2d 222 (2014) ("[T]he ultimate decision on permissive joinder of related charges lies firmly within the discretion of trial courts.") (quotation marks and citation omitted). Ascertaining whether joinder was appropriate involves a mixed question of fact and law. *Gaines*, 306 Mich App at 304. "To determine whether joinder is permissible, a trial court must first find the relevant facts and then must decide whether those facts constitute 'related' offenses for which joinder is appropriate." *People v Williams*, 483 Mich 226, 231; 769 NW2d 605 (2009). "This Court reviews a trial court's factual findings for clear error and its interpretation of a court rule, which is a question of law, de novo." *Gaines*, 306 Mich App at 304. "Whether defendant's charges are related is a question of law that we review de novo." *People v Girard*, 269 Mich App 15, 17; 709 NW2d 229 (2005).

The pertinent court rule, MCR 6.120, provides in relevant part:

(B) Postcharging Permissive Joinder or Severance. On its own initiative, the motion of a party, or the stipulation of all parties, except as provided in subrule (C), the court may join offenses charged in two or more informations or indictments against a single defendant, *or sever offenses charged in a single information or indictment against a single defendant*, when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense.

(1) *Joinder is appropriate if the offenses are related. For purposes of this rule, offenses are related if they are based on*

(a) the same conduct or transaction, or

(b) a series of connected acts, or

(c) *a series of acts constituting parts of a single scheme or plan*.

(2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

(3) If the court acts on its own initiative, it must provide the parties an opportunity to be heard.

(C) Right of Severance; Unrelated Offenses. *On the defendant's motion, the court must sever for separate trials offenses that are not related as defined in subrule (B)(1)*. [Emphasis added.]

-9-

Our Supreme Court explained in *Williams*, 483 Mich at 233, that "[t]he plain language of MCR 6.120 permits joinder if offenses are 'related,' " and that "[o]ffenses are 'related' if they comprise either 'the same conduct' or 'a series of connected acts or acts constituting part of a single scheme or plan.' " (Citations omitted).[12] "[O]ffenses are 'related' for purposes of MCR 6.120(B)(1)(c) when the evidence indicates that the 'defendant engaged in ongoing acts constituting parts of his overall scheme or plan . . . .' " *Gaines*, 306 Mich App at 305, quoting *Williams*, 483 Mich at 235.

In this case, the record supports the conclusion that the two sets of charges stemmed from incidents that were either "a series of connected acts" or "acts constituting parts of a single scheme or plan." MCR 6.120(B)(1)(b) and (c). Both incidents involved the shooting of a Total Relief Dispensary employee, and the shootings occurred approximately two weeks apart. With respect to the October 6, 2015 incident, Colson was shot immediately outside the dispensary by the occupants of a car that had parked across the street, apparently waiting for their victim. With respect to the October 21, 2015 incident, Semma was found shot to death in his pickup truck on Grand River Avenue within a short distance of the dispensary. There was further evidence that shortly before Semma was found, an SUV had parked across the street from the dispensary, waited for approximately an hour, and then followed Semma's truck once he left the dispensary.

In light of this evidence, it is reasonable to conclude that people associated with Total Relief Dispensary were being targeted and that they were being attacked using a common method. Moreover, the evidence that there were disputes involving individuals associated with the dispensary, that defendant was apparently lacking money for food shortly before these shootings, and that defendant had posted photographs to his Instagram account after the murder that showed a large bundle of cash and that showed defendant and Christian labeled as "#shooters" supports the theory that defendant had been paid as part of a plot to target these victims. We conclude that the two shootings were related for purposes of MCR 6.120(B)(1) because they were a series of connected acts or constituted ongoing acts that were part of a single scheme or plan to attack and kill individuals associated with Total Relief Dispensary. *Williams*, 483 Mich at 233; *Gaines*, 306 Mich App at 305.

The evidence at trial also connected defendant to the two shootings through common places and individuals. For example, cell site mapping showed that defendant's cell phone was in the vicinity of each shooting location shortly before each shooting occurred and that his cell phone was in the vicinity of 5444 Holcomb shortly after each shooting. This house on Holcomb was a place that defendant was known to frequent. There was also evidence that a silver Volvo V60 was used in the October 6, 2015 shooting, that Marshall had recently rented the same type of vehicle five days earlier, and that both defendant and the Volvo V60 had disappeared from 5444 Holcomb sometime during the night before the October 6, 2015 shooting. Furthermore, an assault rifle that was used in the October 21, 2015 shooting was found during a search of 5444 Holcomb. "[W]hen the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate." *Williams*, 483 Mich at 237 (quotation marks and citation omitted).

---

[12] Although the *Williams* Court analyzed an earlier version of MCR 6.120, the definition of "related" offenses in the earlier version was substantively the same as the definition in the current version of the rule.

Therefore, the trial court did not err by determining that the two sets of charges were "related" under MCR 6.120(B)(1), and denying defendant's motion for severance, because the charged offenses were "a series of connected acts" or "acts constituting parts of a single scheme or plan." Because the offenses were related, defendant had no absolute right to severance under MCR 6.120(C).

Defendant, in arguing that severance was required, relies primarily on *People v Tobey*, 401 Mich 141; 257 NW2d 537 (1977). However, *Tobey* has been superseded by MCR 6.120 as our Supreme Court explained in *Williams*, 483 Mich at 228:

> This Court first adopted MCR 6.120 on October 1, 1989. Before adopting MCR 6.120, however, we had ruled 12 years earlier that two drug sales to the same undercover agent within 12 days could not be joined because "[t]he two informations charged distinct and separate offenses, and [the defendant] was entitled to a separate trial on each offense." *People v Tobey*, 401 Mich 141, 145; 257 NW2d 537 (1977).
>
> We conclude that the provisions of MCR 6.120 superseded *Tobey*. The unambiguous language of MCR 6.120 permits joinder in a greater range of circumstances than did *Tobey*. [Alterations in original.]

Thus, defendant's reliance on *Tobey* is misplaced.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, defendant argues in the alternative that defense counsel was constitutionally ineffective by not moving for severance earlier. Defendant's motion for severance was filed on January 25, 2017, and defendant's trial began on February 2, 2017.

"A claim of ineffective assistance of counsel presents a mixed question of fact and constitutional law." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008). Factual findings are reviewed for clear error and questions of constitutional law are reviewed de novo. *Id*. However, defendant in this case did not move in the trial court for a new trial or an evidentiary hearing, and our review is therefore "limited to mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

"To prove that defense counsel was not effective, the defendant must show that (1) defense counsel's performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that defense counsel's deficient performance prejudiced the defendant." *Id*. at 80-81, citing *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). "The defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different." *Heft*, 299 Mich App at 81.

In this case, as previously discussed, the charges were related under MCR 6.120(B)(1) and the trial court therefore was not required under MCR 6.120(C) to grant defendant's severance motion. Moreover, to the extent that the trial court could have exercised its discretion to order severance in the interest of fairness under MCR 6.120(B), severance still would not have

-11-

been warranted. As we have also previously discussed, there was a large degree of overlapping proof in this case and, as will be further discussed below, evidence related to both shootings was necessary to sufficiently establish defendant's identity as a participant in each shooting. Considering the nature of the evidence required to prove identity and the high degree of intertwinement of the connections between people, places, and vehicles that were associated with both shootings, the relevant factors weighed against severance. MCR 6.120(B)(2). Thus, an earlier motion would have been futile, and "trial counsel is not ineffective for failing to make a futile motion." *People v Horn*, 279 Mich App 31, 42 n 5; 755 NW2d 212 (2008). Defendant has failed to demonstrate that received ineffective assistance of counsel.

## IV. SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues that there was insufficient evidence to prove his identity as the perpetrator of the offenses.[13]

"A claim that the evidence was insufficient to convict a defendant invokes that defendant's constitutional right to due process of law. This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014) (citations omitted). "[W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). As this Court explained in *People v Murphy*, 321 Mich App 355, 358-359; 910 NW2d 374 (2017):

> When reviewing a challenge to the sufficiency of the evidence, [a]ll conflicts in the evidence must be resolved in favor of the prosecution, and circumstantial evidence and all reasonable inferences drawn therefrom can constitute satisfactory proof of the crime. It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences. [Quotation marks and citations omitted; alteration in original.]

On appeal, defendant only challenges the identity element of his murder and assault convictions. "[I]dentity is an element of every offense." *People v Bass*, 317 Mich App 241, 263; 893 NW2d 140 (2016) (quotation marks and citation omitted; alteration in original). Defendant argues that there was no physical, scientific, or direct evidence implicating him in either shooting and claims that the prosecution's theory was entirely based on conjecture and unpersuasive circumstantial evidence.

Initially, defendant's suggestion that there must be direct evidence linking him to the crimes is without merit. As indicated earlier, circumstantial evidence may constitute satisfactory proof of the crime, *Murphy*, 321 Mich App at 359. Furthermore, identity may permissibly be

---

[13] Defendant does not challenge the sufficiency of the evidence related to the other elements of the offenses for which he was convicted.

established by circumstantial evidence that "requires reliance on an inference founded on an inference." *Bass*, 317 Mich App at 264. However, "inferences may not be based solely on speculation." *Lane*, 308 Mich App at 59. In this case, the circumstantial evidence was sufficient for a rational trier of fact to reasonably find that defendant's identity was proven beyond a reasonable doubt with respect to the commission of these crimes.

First, and perhaps most importantly in terms of providing an evidentiary link between defendant and much of the other evidence, the jury could have reasonably found that the cell phone that was attributed to defendant actually belonged to defendant and would have been in his possession at relevant times. Defendant affirmatively indicated that the cell phone was his when it rang on the scene of defendant's arrest for possessing the stolen Trailblazer SS. Additionally, the usernames for accounts on the phone were consistent with names that defendant went by, as were outgoing text messages identifying the user of the cell phone as "Rudie." The cell phone also contained photographs of defendant that were taken on various dates throughout October 2015. Thus, it was reasonable to infer that this phone was defendant's.

The jury could have also reasonably determined that the cell phone taken from Christian actually belonged to him, considering that it was taken from him during his arrest and contained text messages referring to the user of the phone as "Christian."

Next, there was evidence connecting defendant to particular vehicles around the times of each shooting, and there was further evidence showing that these particular vehicles were used in the shootings. Eyewitness testimony and surveillance video related to the October 6, 2015 incident established that a silver 2015 Volvo V60 was used to carry out the shooting, and the jury could have rationally inferred from Marshall's testimony that defendant took such a vehicle from 5444 Holcomb the previous night. There was also a photograph on defendant's phone that was taken within minutes of the October 6 shooting that showed the inside of a 2015 Volvo V60.

With respect to the October 21, 2015 shooting, surveillance video from around the time of the shooting showed a Trailblazer SS waiting outside Total Relief Dispensary and then following Semma's pickup truck on Grand River Avenue shortly before Semma was found dead in his pickup truck at the intersection of Grand River Avenue and Burt Road. The jury could have reasonably inferred that the trailblazer was involved in the shooting, especially in light of the similarities to the previous shooting: both shootings involved a vehicle staking out the dispensary before initiating an attack on a dispensary employee. Furthermore, defendant was arrested approximately a week after this second shooting while driving a stolen Trailblazer SS, and fingerprints on items recovered from inside the Trailblazer matched fingerprints on file under names that were consistent with defendant's various aliases. Two of these fingerprints were collected from a McDonald's receipt that was found in the Trailblazer SS and dated October 22, 2015. There was also testimony that defendant had been seen driving a Trailblazer SS at some point during the week before he was arrested, and there was an October 23, 2015 photograph on defendant's Instagram account showing a steering wheel with an "SS" emblem. An October 21, 2015 video on Christian's cell phone showed a steering wheel with an "SS" emblem and the Total Relief Dispensary storefront. Christian's cell phone number was designated "Murder C" in defendant's cell phone contact list, and Christian was the brother of defendant's former girlfriend. In short, there was overwhelming circumstantial evidence from

which the jury could rationally infer that defendant was in possession of vehicles at the time of the shootings that were actually used to commit the shootings.

Next, there was evidence from which the jury could have reasonably inferred that defendant was at the scene of each shooting. McGinnis's testimony established that defendant's cell phone was in the vicinity of Total Relief Dispensary within minutes before the October 6, 2015 shooting took place and that defendant was in the vicinity of 5444 Holcomb, a place he was known to frequent, approximately 15 minutes after the 911 call related to the shooting was made. Similarly, McGinnis's testimony established that defendant's cell phone was in the vicinity of the shooting on October 21, 2015, less than 10 minutes before Semma was found deceased. Defendant's cell phone was again in the vicinity of 5444 Holcomb within minutes after the second shooting.

Next, there was evidence connecting defendant to guns used in each shooting. One of the guns used in the October 21, 2015 shooting was found in the house at 5444 Holcomb, where defendant was known to hang out and where defendant fled after each of the shootings. This particular gun was an M4-style assault rifle, and there was a text message from defendant's cell phone to John Lamb's cell phone indicating that defendant wanted to borrow John's M4 so defendant could "just pull up on them." Additionally, during the January 3, 2016 incident in which defendant fled from police near 12201 Morang, police officers found one of the guns used in the October 6, 2015 shooting. Donna, who lived at the apartment on Morang, testified that defendant told her that he tossed a gun during that incident. The other gun used in the October 6, 2015 shooting was found in a red Mazda during the incident on January 30, 2016. Three men were apprehended during the incident, including Rayquan Lamb and Christian. Although defendant was not one of the individuals apprehended, the fourth occupant of the vehicle was never caught or identified. Defendant, however, had connections to both Christian and members of the Lamb family. Rayquan Lamb, who threw the gun into the Mazda, was the cousin of Mikieta, John, and Joseph Lamb. There was also testimony that, on January 29, 2016, defendant was in possession of a red Mazda rented by Ollison and that on January 30, 2016, defendant told Ollison to report the red Mazda stolen.

Finally, there were text messages on defendant's cell phone showing his planning. He referred to his attempts to get "some serious paper," and a photograph on his Instagram account after the second shooting showing a large amount of cash supports the conclusion that defendant was paid to carry out the murder. There was a text message to "Ralf" attempting to arrange transportation and offering to split the proceeds, and a text message to John Lamb suggests that defendant wanted to borrow an assault rifle to commit a drive-by shooting. Text messages between defendant and "Murder C," who was Christian, referred to plans for their "mission."

Viewing all the evidence in a light most favorable to the prosecution, the jury could have reasonably concluded beyond a reasonable doubt that defendant committed these crimes. Defendant essentially argues that there could be other explanations consistent with these facts. However, "[e[ven in a case relying on circumstantial evidence, the prosecution need not negate every reasonable theory consistent with the defendant's innocence, but merely introduce evidence sufficient to convince a reasonable jury in the face of whatever contradictory evidence the defendant may provide." *People v Konrad*, 449 Mich 263, 273 n 6; 536 NW2d 517 (1995).

Moreover, the prosecution was not required to prove that defendant was actually the individual who shot the victims because "[e]very person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." MCL 767.39. The jury was given an aiding and abetting instruction in this case, and as our Supreme Court has explained, "aiding and abetting is not a separate substantive offense" but is instead "simply a theory of prosecution." *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citation omitted). "A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet." *Id*. at 15.[14] In this case, the evidence at trial was sufficient to establish defendant's identity as an active participant, whether as a principle or an aider and abettor, in both shootings.

Affirmed.

/s/ Stephen L. Borrello
/s/ Michael J. Kelly
/s/ Mark T. Boonstra

---

[14] Defendant does not argue on appeal that there was insufficient evidence of the elements necessary to support an aiding and abetting theory.