YOUNG, J.
Defendant and a codefendant, Samuel Pannell, committed an aggravated assault, and Pannell shot and killed the victim, Bernard Thomas. After a bench trial, the trial court convicted defendant of second-degree murder under an aiding and abetting theory. The Court of Appeals reversed the trial court’s judgment, because it concluded that there was insufficient evidence that defendant shared or was aware of Pannell’s intent to kill.
We hold that under Michigan law, a defendant who intends to aid, abet, counsel, or procure the commission of a crime, is liable for that crime as well as the natural and probable consequences of that crime. In this case, defendant committed and aided the commission of an aggravated assault. One of the natural and probable consequences of such a crime is death. Therefore, the trial court properly convicted defendant of second-degree murder. We reverse the judgment of the Court of Appeals and reinstate defendant’s conviction of second-degree murder.
*4 FACTS AND PROCEDURAL HISTORY
According to the evidence adduced at trial, defendant and Pannell went to the house of the victim, Bernard Thomas, with the stated intent to “f*** him up.” Under Pannell’s direction, defendant drove himself and Pannell to the victim’s house. Pannell knocked on the victim’s door. When the victim opened the door, defendant struck him. As the victim fell to the ground, defendant struck the victim again. Pannell began to kick the victim. Defendant told Pannell that “that was enough,” and walked back to the car. When defendant reached his car, he heard a single gunshot.[1]
Following a bench trial, the trial court found defendant guilty of second-degree murder “on the prong of great bodily harm only.”[2] Specifically, the court found that defendant drove Pannell to the victim’s house with the intent to physically attack the victim. The court also found that once at the victim’s home, defendant initiated the attack on the victim, and that defendant’s attack enabled Pannell to “get the upper-hand” on the victim. The court sentenced defendant to a term of 71 months to 15 years.
The Court of Appeals reversed defendant’s murder conviction, holding that there was insufficient evidence to support defendant’s second-degree murder conviction.[3] The Court held that the trial court improperly convicted defendant of second-degree murder because there was no evidence establishing that defendant was aware of or shared Pannell’s intent to kill the victim.
*5 This Court granted the prosecution’s application for leave to appeal, directing the parties to address the elements of accomplice liability and the mens rea required to support a conviction of aiding and abetting second-degree murder.[4]
STANDARD OF REVIEW
The requirements of the aiding and abetting statute[5] are a question of law that this Court reviews de novo.[6] “[W]ords and phrases that have acquired a unique meaning at common law are interpreted as having the same meaning when used in statutes dealing with the same subject.”[7] In evaluating defendant’s claim regarding the sufficiency of the evidence, this Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt.[8] Findings of fact by the trial court may not be set aside unless they are clearly erroneous.[9]
ANALYSIS
This case involves liability under our aiding and abetting statute, MCL 767.39, which provides:
Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commis *6 sion may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.
Unlike conspiracy[10] and felony murder, [11] which also allow the state to punish a person for the acts of another, aiding and abetting is not a separate substantive offense. Rather, “being an aider and abettor is simply a theory of prosecution”[12] that permits the imposition of vicarious liability for accomplices.
This Court recently described the three elements necessary for a conviction under an aiding and abetting theory:
“(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. ”[13]
The primary dispute in this case involves the third element. Under the Court of Appeals analysis, the third element would require the prosecutor to prove beyond a reasonable doubt that a defendant intended to commit the identical offense, here homicide, as the accomplice or, alternatively, that a defendant knew that the accomplice intended to commit the homicide. We reaffirm that evidence of defendant’s specific intent to commit a crime or knowledge of the accomplice’s intent constitutes sufficient mens rea to convict under our aiding *7 and abetting statute. However, as will be discussed later in this opinion, we disagree that evidence of a shared specific intent to commit the crime of an accomplice is the exclusive way to establish liability under our aiding and abetting statute.
AIDING AND ABETTING STATUTE
The theory that a defendant could be liable for another’s criminal actions as an “aider and abettor” goes back to the common law. At common law, there were four categories of offenders to a felony:
(1) principal in the first degree-he actually engaged in the felonious conduct; (2) principal in the second degree-he was present when the felony was committed and aid and abetted its commission; (3) accessory before the fact-he was not present when the felony was committed but aided and abetted prior to its commission; (4) accessory after the fact-he was not present when the felony was committed but rendered aid thereafter in order to protect the felon or to facilitate his escape.[14]
Principals in the second degree had to intend to commit the crime charged or else be aware of the intent of the principal in the first degree to commit that crime.[15] But accessories before the fact were “guilty of all incidental consequences which might reasonably be expected to result from the intended wrong.”[16] Thus, at common law, one could be guilty of the natural and probable consequences of the intended crime or the intended crime itself, depending on whether the actor was a principal in the second degree or an “accessory before the fact.” Michigan’s aiding and abetting statute has been in force and substantively unchanged since the *8 mid-1800s.[17] The 1855 statute, 1855 PA 77, § 19, which is nearly identical to the current statute, stated:
The distinction between an accessory before the fact, and a principal, and between principals in the first and second degree in cases of felony, is abrogated; and all persons concerned in the commission of a felony whether they directly commit the act constituting the offence, or aid and ahet in its commission, though not present, may hereafter he indicted, tried and punished, as principéis, as in the case of a misdemeanor![18]
When a statute employs general common-law terms, courts will interpret the statute by looking to common-law definitions, absent clear legislative intent to change the common law.[19] As this Court has previously indicated, the aiding and abetting statute was a legislative abolition of the common-law distinctions between principals and accessories.[20] Beyond that, there has been little case law from this Court interpreting the language of this statute.[21] However, we note that there is no language in the statute that demonstrates a legislative *9 intent to abrogate the common-law theory that a defendant can be held criminally liable as an accomplice if: (1) the defendant intends or is aware that the principal is going to commit a specific criminal act;[22] or (2) the criminal act committed by the principal is an “incidental consequenceG which might reasonably be expected to result from the intended wrong.” [23]
Accordingly, we hold that when the Legislature abolished the distinction between principals and accessories, it intended for all offenders to be convicted of the intended offense, in this case aggravated assault, as well as the natural and probable consequences of that offense, in this case death. The case law that has developed since the Legislature codified these common-law principles provides examples of accomplice liability under both theories.
NATURAL AND PROBABLE CONSEQUENCES
Under the natural and probable consequences theory, “[t]here can be no criminal responsibility for any thing not fairly within the common enterprise, and which might be expected to happen if the occasion should arise for any one to do it.”[24] In Knapp, the defendant and several other men engaged in sexual intercourse with *10 the victim. After the defendant left, one of the men threw the woman from a second-story window. A jury convicted the defendant of manslaughter. This Court reasoned that because there was no evidence that the defendant threw the victim out the window, the jury must have held him accountable for the actions of the other men.
The Knapp Court reversed the defendant’s conviction for manslaughter because there was no proof that the woman’s death was a part of the “common enterprise” of prostitution because one would not expect it “to happen if the occasion should arise to do it.”[25] Therefore, the defendant could not be held to be an accomplice to the manslaughter.
Similarly, in People v Chapman, this Court held that a defendant was “ ‘responsible criminally for what of wrong flows directly from his corrupt intentions . . . .’ ”[26] Chapman involved a defendant who paid another man $25 to commit adultery with the defendant’s wife so the defendant could divorce her. The defendant watched through a hole in the wall as the other man raped his wife. This Court held that the jury properly convicted the defendant of rape under an accomplice theory of liability because that crime directly flowed from the original corrupt intention to aid adultery.[27]
*11 In view of the framework established by these early cases, the propriety of the trial court’s verdict is clear. The victim’s death is clearly within the common enterprise the defendant aided because a homicide “might be expected to happen if the occasion should arise” within the common enterprise of committing an aggravated assault. The evidence establishes that the victim threatened his children in Pannell’s presence, enraging Pannell.[28] When defendant woke up at 10:00 that evening, Pannell was still “ranting and raving” in the house. Despite knowing that Pannell was in an agitated state, defendant agreed to drive to the victim’s house with the understanding that he and Pannell would “f*** him up.”[29] When the pair arrived at the victim’s home, defendant initiated the assault by hitting the victim once in the face and once in the neck with the back of his hand. After the victim fell to the ground, Pannell punched him twice and began kicking him. In our judgment, a natural and probable consequence of a plan to assault someone is that one of the actors may well escalate the assault into a murder. Just as the planned seduction of the defendant’s wife in Chapman escalated into a rape,[30] Pannell’s anger toward the victim esca *12 lated during the assault into a murderous rage. Defendant argues that he should not be held liable for the murder because he left the scene of the assault after telling Pannell, “That’s enough.” We disagree. Defendant was aware that Pannell was angry with the victim even before the assault. Defendant escalated the situation by driving Pannell to the victim’s house, agreeing to join Pannell in assaulting the victim, and initiating the attack. He did nothing to protect Thomas and he did nothing to defuse the situation in which Thomas was ultimately killed by Pannell. A “natural and probable consequence” of leaving the enraged Pannell alone with the victim is that Pannell would ultimately murder the victim. That defendant serendipitously left the scene of the crime moments before Thomas’s murder does not under these circumstances exonerate him from responsibility for the crime.
The fact that Pannell shot the victim, rather than beat him to death, does not alter this conclusion. It cannot be that a defendant can initiate an assault, leave an already infuriated principal alone with the victim, and then escape liability for the murder of that victim simply because the principal shot the victim to death, *13 instead of kicking the victim to death. Like the defendant in Chapman, whose accomplice used rape, as opposed to seduction, to accomplish their common criminal purpose, the defendant is criminally liable as long as the crime is within the natural and probable consequences of the intended assaultive crime.
INTENDED OFFENSES
The Court of Appeals panel in this case focused on cases that reflect the intended offenses theory, such as People v Kelly[31] to hold that an aider or abettor must have the identical criminal intent as the principal.[32] Kelly involved a murder that occurred during the course of an armed robbery. The jury convicted the defendant as either a principal or an aider and abettor of the felony murder. The Kelly Court affirmed his conviction. In analyzing the aiding and abetting charge, this Court cited Meister v People[33] for the proposition that “[t]he requisite intent is that necessary to be convicted of the crime as a principal.”[34]
Under Kelly, a defendant is liable for the offense the defendant intended to commit or intended to aid and abet. However, the Court of Appeals panel in this case went further than Kelly, and required the accomplice to have the identical intent as the principal.[35] This narrow *14 construction is not compelled by Kelly. Kelly addressed aiding and abetting felony murder. Under People v Aaron, to sustain a felony murder conviction, the prosecution must prove that each defendant had the necessary malice to be convicted of murder.[36] Aaron makes clear that one who aids and abets a felony murder must have the requisite malice to be convicted of felony murder, but need not have the same malice as the principal. This principle extends to other crimes: sharing the same intent as the principal allows for accomplice liability. However, sharing the identical intent is not a prerequisite to the imposition of accomplice liability under the common-law principles discussed earlier.
The Court of Appeals misread Kelly. In accordance with the common-law principles incorporated in the statute, Kelly simply stands for the proposition that, at a minimum, the aider and abettor is liable for the crime he or she had the intent to commit. Even under the intended offense theory, the defendant’s conviction must stand. The intent necessary for second-degree murder is the intent to kill, the intent to inflict great bodily harm, or the willful and wanton disregard for whether death will result.[37] In this case, the judge specifically found that defendant intended to inflict great bodily harm, which is sufficient to convict him of second-degree murder.
The two approaches outlined above are not in conflict. Instead, they merely represent two different tests for liability under an aiding and abetting theory.[38] Under these two tests, a defendant is liable for the *15 crime the defendant intends to aid or abet[39] as well as the natural and probable consequences of that crime. In this case, the trial court found that defendant intended to inflict great bodily harm.[40] That intent is sufficient for a conviction of aggravated assault or second-degree murder. Alternatively, defendant is liable for the homicide because death is one of the natural and probable consequences of aggravated assault, the crime defendant committed and aided. Either analysis is sufficient to support defendant’s conviction.
CONCLUSION
We hold that a defendant must possess the criminal intent to aid, abet, procure, or counsel the commission of an offense. A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet. Therefore, the prosecutor must prove beyond a reasonable doubt that the defendant aided or abetted the commission of an offense and that the defendant intended to aid the charged offense, knew the principal intended to commit the charged offense, or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense.
Under either prong of the aiding and abetting analysis, defendant was properly convicted. Because the *16 Court of Appeals erred in reversing defendant’s conviction of second-degree murder, we reverse the judgment of the Court of Appeals and reinstate defendant’s conviction.
Taylor, C.J., and Weaver, Corrigan, and Markman, JJ., concurred with YOUNG, J.

 The parties stipulated that the victim died from a gunshot wound. Defendant stated that he did not shoot the victim and that only he, Pannell, and the victim were at the victim’s house.

 A jury convicted Pannell of first-degree murder.

 Unpublished opinion per curiam of the Court of Appeals, issued April 29, 2004 (Docket No. 237036).

 472 Mich 898 (2005).

 MCL 767.39.

 People v Schaefer, 473 Mich 418, 427; 703 NW2d 774 (2005).

 Pulver v Dundee Cement Co, 445 Mich 68, 75; 515 NW2d 728 (1994).

 People v Hardiman, 466 Mich 417, 421; 646 NW2d 158 (2002).

 MCR 2.613(C).

 MCL 750.157a.

 MCL 750.316(l)(b).

 People v Perry, 460 Mich 55, 63 n 20; 594 NW2d 477 (1999).

 People v Moore, 470 Mich 56, 67-68; 679 NW2d 41 (2004), quoting People v Cannes, 460 Mich 750, 768; 597 NW2d 130 (1999) (change in Moore).

 Wharton’s Criminal Law (15th ed), p 181.

 Perkins, Criminal Law (3d ed), pp 741-743.

 Id. at 745.

 In 1927, the Legislature amended the language to its present form, which substitutes “procures, counsels, aids, or abets” for “aid and abet.” This change did not affect the meaning of the statute because the common-law definition of “aid and abet” is to “[h]elp, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission.” Black’s Law Dictionary (5th ed), p 63. The Legislature merely added terms that were synonymous with the common-law definition of “aid and abet.”

 See also 1857 CL 6065 (same); 1897 CL 11930 (same); 1915 CL 15757 (changing “c” to “s” in “offence”); 1927 PA 175, ch VII, § 39 (same as MCL 767.39); 1929 CL 17253 (same); 1948 CL 767.39 (same); and 1970 CL 767.39 (same).

 People v Riddle, 467 Mich 116, 125-126; 649 NW2d 30 (2002).

 People v Palmer, 392 Mich 370, 378; 220 NW2d 393 (1973).

 As will be discussed later in this opinion, there have been numerous cases discussing aiding and abetting liability, but none of those cases focused on the language of the statute.

 Perkins, Criminal Law (3d ed), pp 741-743.

 Id. at 745. Justice Kelly misapprehends our holding as “improperly extend[ing] the reach of Michigan’s aiding and abetting statute, MCL 767.39.” Post at 20. When the Legislature first codified the aiding and abetting statute in 1855, it reflected an express intent to abrogate the common-law distinction between principals and accessories. However, in all other regards, the Legislature did not utilize language reflecting an intent to abrogate the common-law theories under which an accessory can be held criminally hable for the acts of a principal. One such theory of liability is predicated on the “natural and probable consequences” of a planned criminal act. Perkins, supra.

 People v Knapp, 26 Mich 112, 114 (1872).

 Id. at 115. See also People v Foley, 59 Mich 553, 556; 26 NW 699 (1886) (Defendants, who brutally assaulted the victim, “should nevertheless not be convicted of robbery unless robbery was within their common purpose.”) (emphasis added).

 62 Mich 280, 286; 28 NW 896 (1886) (quoting 1 Bishop, Criminal Law, § 641).

 However, this Court ultimately overturned his conviction on other grounds because the preliminary examination testimony did not meet statutory requirements.

 Prosecution witness Brandi Brewer, defendant’s fiancé, testified that the victim “told his wife he was going to beat the kids ass, and do something to her ....”

 Justice Kelly argues that “[a]s a practical matter, f***ing up someone necessarily entails leaving them alive.” Post at 26. However, literally in the next breath, she includes in the definition of “f***”: “ ‘[t]o break or destroy.’ ” Id. at 26 n 7, quoting <http://en.wiktionary.Org/wiki/f***> (accessed April 19, 2006). We note that the word “destroy” is also defined as “2. to put an end to, extinguish; 3. to kill; slay.” Random. House Webster’s College Dictionary (1997) (emphasis added). Thus, Justice Kelly’s own definition belies her statement that the word cannot, in any context, be used to mean actions that are likely to result in a killing.

 Justice Kelly notes that Chapman defined an accomplice's liability as follows: “ ‘ “If one person sets in motion the physical power of another *12 person, the former is criminally responsible for its results. If he contemplated the result, he is answerable, though it is produced in a manner he did not contemplate.” ’ ” Post at 27, quoting Chapman, supra at 286 (citations omitted) (emphasis added).
Justice Kelly argues that because defendant never contemplated Pannell’s shooting the victim, he cannot be held answerable under the law for that shooting. We disagree. Here, defendant set into motion the violent physical assault of the victim perpetrated by himself and Pannell. The evidence clearly demonstrates that defendant “contemplated” causing great bodily harm to the victim. One of the potential consequences of causing great bodily harm is that the ultimate result could be the death of the victim. That the death in this case was produced by Pannell’s shooting of the victim rather than because of beating injuries sustained by the victim does not absolve defendant from his criminal responsibility.

 423 Mich 261; 378 NW2d 365 (1985).

 The Court of Appeals panel also relied on People v Barrera, 451 Mich 261, 294; 547 NW2d 280 (1996), but in that case this Court merely quoted from Kelly without any additional analysis. Further, the discussion of Kelly was in response to the dissent in Barrera, not part of the substantive analysis of the opinion that dealt with MB.E 804(b)(3).

 31 Mich 99 (1875).

 Kelly, supra at 278.

 This Court has recently repudiated the notion that conviction under an aiding and abetting theory can require a higher level of intent than would be necessary to convict a principal. People v Mass, 464 Mich 615, 628; 628 NW2d 540 (2001).

 People v Aaron, 409 Mich 672, 731; 299 NW2d 304 (1980).

 People v Langworthy, 416 Mich 630, 650-651; 331 NW2d 171 (1982).

 We note that none of the older aiding and abetting cases, such as Chapman, has been overruled, and they remain sound law in Michigan.

 This includes both intending to commit the crime and aiding someone with knowledge that he or she intends to commit the crime.

 We fail to see how Justice Kelly can conclude that we concluded that defendant was aware of or shared Pannell’s intent to kill. On the contrary, we have explicitly based our holding on the fact that defendant’s intent to inflict great bodily harm is sufficient to maintain his conviction for the resulting death of the victim.