*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TERRELL MARCUS ROBERTS,

Defendant-Appellant.

FOR PUBLICATION
March 24, 2020
9:05 a.m.

No. 339424
Ingham Circuit Court
LC No. 16-000384-FC

ON REMAND

Before: RIORDAN, P.J., and RONAYNE KRAUSE and SWARTZLE, JJ.

RONAYNE KRAUSE, J.

Defendant was convicted by a jury of being a felon in possession of a firearm (felon-in-possession), MCL 750.224f, and of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The jury found defendant not guilty of assault with intent to commit murder (AWIM), MCL 750.83, on an aiding and abetting theory, MCL 767.39. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to 48 to 90 months' imprisonment, an upward departure from his minimum sentencing guidelines range of 14 to 36 months, consecutive to a mandatory 2 years' imprisonment for felony-firearm. Defendant previously appealed his convictions and sentences, and we affirmed.[1] Our Supreme Court vacated in part our opinion regarding defendant's departure sentence and remanded for reconsideration in light of *People v Beck*, 504 Mich ___; ___ NW2d ___ (2019) (Docket No. 152934). We again affirm.

I. BACKGROUND

---

[1] *People v Roberts*, unpublished per curiam opinion of the Court of Appeals, issued December 4, 2018 (Docket No. 339424).

In our previous opinion, we provided the following summary of the facts:

This case arises out of a shooting that occurred at Secrets Nightclub (Secrets) in downtown Lansing in the early morning hours of May 24, 2015. At approximately 12:30 a.m., a Secrets patron was shot while inside of the nightclub. Defendant was inside Secrets when the shooting occurred, and he, along with other patrons, fled the club. Sergeant Brian Curtis of the Lansing Police Department and several other officers were parked in their patrol vehicles monitoring the club. Sergeant Curtis observed several patrons leave the club "in a panic." Shortly after, dispatch informed Sergeant Curtis of the shooting, and he activated the mobile vehicle recording device ("MVR") on the front of his patrol car.

Sergeant Curtis heard gunshots and simultaneously observed two individuals, later identified as defendant and LaDon Jackson, advancing towards a group of people outside the club. Sergeant Curtis later reviewed the MVR video and observed that it was Jackson who fired these shots. The MVR video, which was admitted into evidence and played for the jury at trial, also showed defendant and Jackson make contact with each other. Sergeant Curtis testified at trial that he believed that, during this contact, defendant passed a gun to Jackson, who then fired the shots and returned the gun to defendant.

After Jackson fired the shots, Sergeant Curtis observed both defendant and Jackson run south, and another officer informed Sergeant Curtis that these individuals might be in possession of a firearm. Sergeant Curtis pursued defendant and Jackson in his patrol vehicle and commanded them to stop, but they refused to comply. Jackson executed a "button hook" maneuver to evade police, but defendant continued running south alone. Sergeant Curtis pursued defendant and observed him pass by a red Impala and make certain movements that, in Sergeant Curtis's training and experience, led him to believe that defendant had discarded a firearm in that area. After passing the red Impala, defendant continued along the sidewalk, and he was arrested shortly thereafter. Police found no firearm in either Jackson's or defendant's possession. However, a canine unit trained to detect firearms located a firearm next to the red Impala that defendant had passed.

* * *

As the jury was shown the MVR video, Sergeant Curtis testified:

[Y]ou're going to see a transaction what I believed [sic] where LaDon Jackson receives the firearm from the Defendant. LaDon Jackson advances at the crowd, does the shooting, comes back and exchanges the firearm back to the Defendant.

* * *

It is my belief that they're exchanging a firearm right there.

* * *

-2-

And here is LaDon Jackson advancing, firing his gun.

* * *

Here [defendant's] reaching into his upper torso.

* * *

And now here he goes right here to the passenger side. I believe he discretely tossed the gun right there.

Sergeant Curtis explained that, in his experience and training, weapons often "change hands" on the streets. He further explained "that people do not hold onto firearms. They trade them off with one another, especially during an event like this." Sergeant Curtis testified that after he heard the gunshots, he observed defendant and Jackson both "run back in a south direction after they advanced on a group to the north." Sergeant Curtis stated that he observed defendant reach "into his upper torso." . . . Additionally, Sergeant Curtis commanded defendant to stop, but he refused to comply, "continued to evade," and passed "directly near the passenger side of this red Impala," which is where the gun was eventually found. In contrast, Sergeant Curtis testified that Jackson was never in the vicinity of the red Impala. [*People v Roberts*, unpublished per curiam opinion of the Court of Appeals, issued December 4, 2018 (Docket No. 339424), unpub op at pp 1-4 (footnotes omitted).]

Additionally, we now set forth in full the trial court's stated reasoning for imposing its departure sentence:

Well, Mr. Roberts, your attorney said something about your [sic] very capable of being a highly functioning member of the community and I 100% agree with that. I think you are very capable of that. Your actions have definitely not demonstrated that. Not only for this offense that you've been convicted of, these offenses, but you were on probation out of Eaton County for 2nd Degree Home Invasion, another very serious offense, at the time that you committed this offense. So, you are taking whatever potential that you have to be a highly functioning and contributing member of society and you're making decisions consciously and intentionally that are destroying that. And when it comes to gun violence, I agree that this is the scourge of this community. It is something that tears families apart, no matter what side of this they are on. It tears families apart. It destroys lives. And that's speaking again from both sides, it destroys lives. It has to be stopped and I don't know how to stop it other than to send a strong message that running around the streets of Lansing with a gun is not tolerated, not acceptable and will be significantly punished. And I do consider this to be different than the person who possesses a firearm while convicted of a felony under different circumstances. I see people convicted of that when they've possessed a gun in their own home but, they've been convicted of a felony and they may not have a possession of a gun.

-3-

That's one thing. This is much higher up on the scale as far as I'm concerned than that. And I hold you not one bit accountable for what happened in the night club, not part of the charge, not part of the conviction. But what I hold you accountable for is possessing a firearm on the streets of Lansing under these circumstances where a shooting had just taken place by someone else. And I consider that to be at the highest end of the scale as far as seriousness of the offense goes for possession of a firearm by a felon.

So, I have considered the guidelines of 14 to 36 months and they are presumptively reasonable in my mind but, I also consider then [sic] somewhat inadequate for the circumstances of this particular case.

## II. STANDARDS OF REVIEW

Sentencing courts are required to properly score the statutory sentencing guidelines and take the resulting minimum sentence range into account when crafting a particular sentence. *People v Lockridge*, 498 Mich 358, 391-392; 870 NW2d 502 (2015); *People v Steanhouse*, 500 Mich 453, 474-475; 902 NW2d 327 (2017). However, sentencing courts are not otherwise bound by the sentencing guidelines. *Lockridge*, 498 Mich at 392; *Steanhouse*, 500 Mich at 468-470. The sentencing court may, in its discretion, depart from that range if it explains how that departure is reasonable and proportionate. *Lockridge*, 498 Mich at 392; *Steanhouse*, 500 Mich at 473-475. We review the trial court's ultimate sentence for reasonableness under an abuse of discretion standard, to determine whether it is proportionate to the offender and the circumstances of the offense. *Steanhouse*, 500 Mich 459-460, 473-474. A minimum sentence that falls within the properly-calculated guidelines range is presumptively reasonable and proportionate. See *People v Carpenter*, 322 Mich App 523, 532; 912 NW2d 579 (2018).

"Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. The sentencing court may consider "facts not admitted by the defendant or found beyond a reasonable doubt by the jury." *Lockridge*, 498 Mich at 392. "Offense variables are properly scored by reference only to the sentencing offense except when the language of a particular offense variable statute specifically provides otherwise." *People v McGraw*, 484 Mich 120, 135; 771 NW2d 655 (2009).

## III. *BECK*

It has long been understood that failure to persuade a jury beyond a reasonable doubt is not conclusive as to proofs under the less stringent preponderance of the evidence standard. *Stone v United States*, 167 US 178, 188-189; 167 S Ct 778; 42 L Ed 127 (1897); *Martucci v Detroit Comm'r of Police*, 322 Mich 270, 273-274; 33 NW2d 789 (1948). Nevertheless, our Supreme Court has recently taught us that sentencing courts may not consider any "acquitted conduct" in crafting their sentences, although they remain free to consider "uncharged conduct." *Beck*, 504 Mich at ___ (slip op at pp 18-19). "Acquitted conduct" means any "conduct . . . underlying charges of which [the defendant] had been acquitted." *United States v Watts*, 519 US 148, 149;

117 S Ct 633; 136 L Ed 2d 554 (1997), cited by *Beck*, 504 Mich at ___ n 1 (slip op at p 2 n 1). We infer from this broad definition that under *Beck*, a sentencing court must consider a defendant as having undertaken no act or omission that a jury could have relied upon in finding the essential elements of any acquitted offense proved beyond a reasonable doubt. Nevertheless, as we will discuss in more detail below, *Beck* expressly permits trial courts to consider uncharged conduct and any other circumstances or context surrounding the defendant or the sentencing offense.

## IV. OFFENSE VARIABLE 9

As we explained previously, "[o]ffense variable 9 is number of victims." MCL 777.39(1). The trial court assessed 25 points for OV 9, which is required if "[t]here were 10 or more victims who were placed in danger of physical injury or death, or 20 or more victims who were placed in danger of property loss . . . " MCL 777.39(1)(b). "[E]ach person who was placed in danger of physical injury or loss of life or property" is to be counted as a victim. MCL 777.39(2)(a). However, "only people placed in danger of injury or loss of life when the sentencing offense was committed (or, at the most, during the same criminal transaction) should be considered." *People v Sargent*, 481 Mich 346, 350; 750 NW2d 161 (2008). Defendant's sentencing offense was felon-in-possession, which "in and of itself, simply did not place anyone in danger of physical injury or death." *People v Biddles*, 316 Mich App 148, 167; 896 NW2d 461 (2016).

The trial court explicitly declined to hold defendant responsible for "what happened in the night club," implicitly meaning the trial court did not consider any victims placed in danger *by the shooting* of which defendant was acquitted. Nevertheless, we agree with the trial court that a substantial and qualitative difference exists between possessing contraband in one's own home, and unlawfully possessing and passing around a concealed firearm in a crowded bar during a shooting. Nothing in *Beck* precludes a sentencing court from generally considering the time, place, and manner in which an offense is committed. We conclude that *Beck* does not exclude from consideration the contextual fact that the acquitted conduct was committed by someone, so long as that conduct is not actually attributed to the defendant. Irrespective of whether defendant participated in the shooting, the context within which he committed the offense of felon-in-possession intrinsically placed people in grave danger. We therefore reiterate our previous conclusion that the trial court was justified in finding that defendant's actions placed at least 10 victims in danger of physical injury or death. The trial court therefore did not err in assigning 25 points under OV 9.

## V. DEPARTURE SENTENCE

In our previous opinion, we set forth the following reasoning:

In this case, the trial court stated that it had considered the guidelines and found them to be "somewhat inadequate for the circumstances of this particular case." The factors the trial court identified in support of the departure were the danger of gun violence to the local community, the seriousness of the particular offense, and defendant's poor potential for rehabilitation. Although some of the factors the court stated as reasons for departure were somewhat considered by the guidelines, those guidelines were not adequately tailored for this specific type of offense, and therefore departure was appropriate. As the trial court noted, felon in

possession of a firearm can take many forms, some more dangerous than others. The trial court properly noted that the conduct in the present case, where defendant supplied a weapon for use in an indiscriminate shooting on a busy street, was vastly different than the case of a felon being found in possession of a firearm in their home.

The trial court noted the danger that gun violence presented to the local community and the seriousness of this particular offense. The trial court stated that it held defendant "accountable for . . . possessing a firearm on the streets of Lansing *under these circumstances where a shooting had just taken place by someone else*" (emphasis added). It reasoned that defendant's possession of the firearm under these circumstances was more serious than was ordinarily the case with a felon-in-possession offense. Further, defendant's potential for rehabilitation has been held to be a valid consideration for departure, see [*People v Dixon-Bey*, 321 Mich App 490, 525 n 9; 909 NW2d 458 (2017)]. The fact that defendant was on probation, while accounted for in the guidelines, is further proof of the seriousness of the specific offense and lack of potential for rehabilitation. Defendant was not merely a felon, but was currently being punished for a serious felony offense in a neighboring county. The fact that he proceeded to bring a concealed handgun to a crowded night club and then allow that weapon to be fired into a crowd in an indiscriminate manner is not something that can be adequately captured by the guidelines system. This is precisely the type of situation where the ability to consider all of the evidence and the factors involved in the commission of a crime is more valuable than the rote, mathematical system conceived in a purely determinant sentencing system.

In summary, the trial court, presented with a crime and defendant that do not neatly fit within the sentencing guidelines, properly applied its discretion and articulated valid reasons for doing so and exceeding guidelines by 12 months. Defendant did not fit in to the more benign categories of a felon in possession and, based on the risk of his actions and his apparent lack of rehabilitation, the trial court found departure to be necessary. Therefore, we affirm defendant's sentence.

*Beck* requires us to clarify our reasoning in small part, but we find no basis for revisiting our prior conclusion.

As discussed, the definition of "acquitted conduct" covers a broad range of conduct. Nevertheless, we do not understand *Beck* to preclude all consideration of the entire *res gestae* of an acquitted offense.[2] As noted, defendant was acquitted of AWIM under an aiding and abetting theory. "Aiding and abetting" requires *intentionally* assisting another person in the commission of a *particular* crime. See *People v Moore*, 470 Mich 56, 70-71; 679 NW2d 41 (2004); *People v*

---

[2] We wholeheartedly agree with our concurring colleague's discussion regarding the implementation concerns left by *Beck*, as well as our concurring colleague's thoughts on how best to address those concerns, and we adopt them as our own. We further note that "I know it when I see it" is literally no standard at all.

*Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006).  We conclude that even under *Beck*, a sentencing court may consider, for example, the fact that a felon on probation bringing a concealed gun into a crowded nightclub demonstrates—at a minimum—an appallingly reckless disregard for the predictable outcome.  Defendant may not be deemed to have provided a weapon for the purpose of shooting it into a crowd, nor can defendant be deemed to have "allowed" the shooting.  Nevertheless, defendant can certainly be deemed to have knowingly acted in a manner that drastically increased the likelihood that such a tragedy, whether or not this particular tragedy, would occur.  As discussed above, the trial court appropriately observed that it is "one thing" to illegally possess a gun in one's own home, but quite another to introduce an illegally possessed and concealed gun into an environment that was already chaotic and unstable.

Consequently, even though defendant may not be considered to have engaged in any conduct that aided and abetted the shooting, the trial court nevertheless reasonably concluded that the manner in which defendant committed the offense of felon-in-possession, particularly in light of defendant's apparent intelligence and own history, warranted a significant departure from the guidelines range.  We reiterate our previous conclusion.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Michael J. Riordan