*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
January 21, 2021

v

TYLOR RAY WRIGHT,

Defendant-Appellant.

No. 349291
Ingham Circuit Court
LC No. 18-000153-FC

Before: GADOLA, P.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

A jury found defendant guilty of second-degree murder, MCL 750.317.[1] The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to serve 30 to 50 years in prison. Defendant now appeals by right, challenging the sufficiency of the evidence supporting his second-degree murder conviction. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case involves the shooting and murder of Timothy Southwell, which is believed to have occurred on Saturday, May 20, 2017. The exact time is not known because Southwell's body was not discovered until days after. Although not his biological grandfather, defendant considered Southwell to be his grandfather, and the two lived together at Southwell's residence. Southwell's employer filed a missing person's report after Southwell failed to show up for work on the Monday and Tuesday following May 20.

On May 24, police performed a welfare check at Southwell's residence and ultimately discovered Southwell's body decomposing in a backyard shed that had been secured by a padlock. Defendant was found locked in one of the bedrooms, and he had cut his wrists. Police arrested defendant and provided medical treatment for his wounds. It was determined from an autopsy that

---

[1] The jury found defendant not guilty of open murder, MCL 750.316, and felony-firearm, MCL 750.227b.

Southwell's death was caused by a gunshot wound to the head, that the manner of death was homicide, and that the state of the body was consistent with Southwell having died on May 20.

Forensic evidence supported a theory that Southwell was sitting in a living room chair at the time of the murder and was subsequently dragged to the shed. This evidence included blood on the chair, cleaning supplies and bleach next to the chair, blood stains on the floor that had been covered by rugs, bloody rags and clothing in the closet, and drag marks containing human blood leading from the house to the shed. Evidence showed that defendant made multiple transactions with Southwell's credit and debit cards, and pawned a lawn tractor, in the days immediately following the murder.

The prosecutor's primary theory was that defendant shot and killed Southwell for financial reasons and subsequently tried to cover up the crime. The prosecutor's secondary theory was that defendant aided and abetted in Southwell's murder with the help of another individual, Darrius Craddieth, who was present in the immediate area in the moments leading up to the believed time of the shooting.

Eyewitness testimony, along with footage from a neighbor's surveillance camera, revealed that Craddieth and defendant were both at Southwell's residence in the afternoon and evening of May 20. Additionally, shortly after approximately 6:30 p.m., witnesses from the neighborhood heard gunshots from the direction of Southwell's residence. These neighbors testified that shortly before hearing the gun shots, they witnessed a man get out of a red Ford Focus and walk toward Southwell's residence. A woman was driving the Focus. Shortly after the gunshots, the neighbors observed the same man walking from near Southwell's residence back toward the Focus in which he had arrived. The man and woman then left in the Focus. The testimony of Craddieth's former girlfriend showed that she had driven Craddieth to the residence in a red Ford Focus in order to meet with defendant that night because defendant owed Craddieth money. Her testimony, however, was somewhat equivocal and full of claims that she did not remember various events or details from that night. She claimed that at one point, she parked down the street from Southwell's residence and Craddieth got out of the car to smoke a cigarette and talk on his cell phone. According to her, Caraddieth only went down to the corner and back to the car, never leaving her sight.

Defendant was charged with open murder, second-degree murder, and possession of a firearm during the commission of a felony (felony-firearm), but the jury found him guilty only of second-degree murder.

## II. ANALYSIS

Defendant argues on appeal that the prosecution presented insufficient evidence to convict him of second-degree murder under an aiding-and-abetting theory.

A claim of insufficient evidence is reviewed de novo on appeal. *People v Solmonson*, 261 Mich App 657, 661; 683 NW2d 761 (2004). All "factual conflicts are to be viewed in a light favorable to the prosecution." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). The appellate court must "view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that

the essential elements of the crime were proven beyond a reasonable doubt." *Id*. "All the elements of an offense may be proved beyond a reasonable doubt by circumstantial evidence and reasonable inferences therefrom." *Solmonson*, 261 Mich App at 661.

To sustain a second-degree murder conviction, a prosecutor must prove four elements: "(1) a death, (2) the death was caused by an act of the defendant, (3) the defendant acted with malice, and (4) the defendant did not have lawful justification or excuse for causing the death." *People v Smith*, 478 Mich 64, 70; 731 NW2d 411 (2007). However, even if a defendant did not directly cause the death, the defendant may still be held liable under Michigan's aiding-and-abetting statute, which provides: "Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." MCL 767.39.

"[A]iding and abetting is not a separate substantive offense. Rather, 'being an aider and abettor is simply a theory of prosecution' that permits the imposition of vicarious liability for accomplices." *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (citation omitted). There are three elements to prove an aiding and abetting theory:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*Id*. (quotation marks and citation omitted; alteration in original).]

"An aider and abettor's state of mind may be inferred from all the facts and circumstances," and, moreover, "[f]actors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999) (quotation marks and citation omitted). " 'Aiding or abetting' includes all forms of assistance. The quantum of aid or advice is immaterial as long as it had the effect of inducing the crime." *People v Lawton*, 196 Mich App 341, 352; 492 NW2d 810 (1992) (citation omitted).

In this case, defendant's sole argument is that the prosecution did not introduce sufficient evidence to establish beyond a reasonable doubt that defendant aided and abetted the commission of the murder. The evidence that Southwell died from a gunshot wound to the head and was subsequently hidden in a locked backyard shed clearly supported the conclusion that the victim was murdered by someone, and defendant does not challenge this element. Instead, the question becomes whether there was sufficient evidence of defendant's assistance and intent. *Robinson*, 475 Mich at 6.

There was admittedly little direct evidence of the circumstances surrounding Southwell's murder, and defendant focuses his arguments on this fact, but there was sufficient indirect evidence from which the jury could infer defendant's involvement in Southwell's murder. Defendant testified and acknowledged he was in the house on the afternoon and evening of May 20. Video surveillance evidence also placed defendant at the residence during the same approximate time

frame in which two neighbors heard gun shots from the direction of Southwell's residence. Defendant's defense was that he left the house and, when he returned, found Southwell dead in the living room chair.

However, his actions immediately following Southwell's death could convince a rational trier of fact that defendant participated in Southwell's murder and that he had potential financial reasons for doing so. Southwell's employer testified that Southwell had very recently indicated he was going to stop supporting defendant financially. Defendant conceded to being involved with drug dealing, and drug paraphernalia was discovered in Southwell's house. Testimony also showed that defendant owed Craddieth money and that Craddieth attempted to retrieve his money multiple times leading up to the murder. Ammunition was found in the house. There was evidence that, leading up to the gunshots heard on May 20, Craddieth was a passenger in a parked vehicle around the corner of Southwell's residence and in frequent communication with defendant. Craddieth was seen walking toward Southwell's residence immediately preceding the gunshots; moreover, one witness believed he saw the driver of the vehicle hand something to Craddieth.[2] Immediately after the gunshots, Craddieth was seen leaving the area in front of Southwell's residence.

Later in the evening of May 20 and following the likely time of Southwell's murder, calls began to be made to Southwell's various financial institutions. Moreover, defendant began pawning items, purchasing items, and obtaining cash back with Southwell's various debit and credit cards. Southwell's body was moved to a shed. Police testified that there was evidence of an attempt to clean up the blood from the chair and floor. Bloody rags and clothing were found hidden inside Southwell's residence, where defendant also lived. By defendant's own admission, defendant's plan was to gather enough money to disappear. Flight can be evidence of guilt. *Carines*, 460 Mich at 758. Defendant testified that he merely found Southwell dead in the chair when he returned; yet he acknowledged that he failed to contact police and eventually moved Southwell's body to the shed. Defendant testified, in fact, that he left Southwell's corpse in the chair for two days before finally deciding to move it to the shed. Defendant admitted at trial that he lied to police about Southwell's whereabouts and death.

From such abnormal actions on the part of defendant, along with the other circumstantial evidence connecting defendant to the murder, the jury could reasonably infer defendant's participation in Southwell's murder as well as an attempt to cover up the crime. Contrary to defendant's contention, such an inference does not constitute mere speculation. Viewing the record evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant performed acts or gave encouragement assisting in the commission of Southwell's murder, while intending the murder or knowing that the principal

---

[2] Craddieth's former girlfriend testified that she never saw Craddieth with a gun that night. However, when reviewing the sufficiency of the evidence supporting a conviction, conflicts in the evidence are resolved in favor of the prosecution. *Wolfe*, 440 Mich at 515.

intended to commit the murder. *Wolfe*, 440 Mich at 515; *Robinson*, 475 Mich at 6. Therefore, defendant has not shown that the evidence was insufficient to support his conviction.[3]

Affirmed.

/s/ Michael F. Gadola
/s/ Stephen L. Borrello
/s/ Michael J. Kelly

---

[3] To the extent defendant appears to insinuate that his conviction must be vacated because the jury rendered an inconsistent verdict by acquitting him of the felony-firearm charge and convicting him of second-degree murder, this argument is without merit. The fact that a jury renders inconsistent verdicts, one of which is an acquittal, does not require reversal of the conviction; there is no requirement that jury verdicts be logically consistent. *People v Vaughn*, 409 Mich 463, 464-466; 295 NW2d 354 (1980). "Juries are not held to any rules of logic nor are they required to explain their decisions." *Id*. at 466. Additionally, because we do not know on what theory the jury convicted defendant, the verdicts were not necessarily inconsistent.