*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

STEVEN MICHAEL HIGHLAND,

Defendant-Appellant.

UNPUBLISHED
April 15, 2026
10:50 AM

No. 370378
Jackson Circuit Court
LC No. 2023-004346-FH

Before: TREBILCOCK, P.J., and BOONSTRA and LETICA, JJ.

PER CURIAM.

Defendant appeals by right his jury trial conviction of operating while visibly impaired (OWVI) as a third offense, MCL 257.625(3); MCL 257.625(11)(c). The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to 365 days' imprisonment, followed by 24 months of probation. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises from a Jackson County resident's call for emergency services after discovering defendant passed out behind the wheel of his vehicle. The caller was driving after dark on November 13, 2022, when he noticed a pickup truck that was "parked in the middle of the road" with its interior lights on. He saw defendant "slumped over the steering wheel" inside the truck. The caller turned his vehicle around, parked behind the truck, and activated his vehicle's hazard lights.

The caller approached the driver's side window, knocked several times, and yelled through the cracked window, but he received no response. He called the police, thinking that defendant was dead. Because the window was partially down, the caller reached inside, unlocked the door, and took the keys out of the ignition. He began rubbing defendant's sternum with his knuckles to wake him. Defendant woke up momentarily, said that he had been "partying down at the lake and that he had been drinking," and then he "nodded back out." The caller thought that defendant "stunk" of alcohol.

-1-

Police, fire, and medical services arrived within minutes. Two Jackson County Sheriff's Office deputies questioned defendant after he received attention from medical personnel. As Deputy Zachary Vetor approached the driver's side window, he detected the smell of alcohol. Defendant denied that he was intoxicated. He stated that he had taken "Ibuprofen and some blood pressure medication" but denied taking any controlled substances. Defendant later informed Deputy Emma Freeman "that he had twenty-four ounces [of alcohol] before the incident." Deputy Freeman observed that defendant "was kind of in and out" and "groggy" with "droopy eyelids" and "thick slurred speech." She was unable to smell anything at the time because she had not yet regained her sense of smell after recovering from COVID-19 about a month earlier.

The deputies conducted a standardized field sobriety test. Defendant was unable to perform the one-legged-stand test or the walk-and-turn test. Deputy Vetor noted that defendant was "shaky and rocking back and forth," but he also acknowledged that the weather was cold that evening. Defendant was unable to complete the Horizontal Gaze Nystagmus test because he "kept closing his eyes" and "putting his head down." Throughout the interaction, defendant appeared "very restless" and was "unable to hold still" or "follow basic directions."

Defendant consented to a preliminary breath test (PBT), which produced a result of 0.019% blood alcohol level. At that point, the deputies suspected that "it was possibly narcotics." Deputy Freeman testified that defendant "was very irritable and agitated," which she described as "a common sign in someone that's under the influence of something," like being drunk or "intoxicated by a controlled substance." Defendant also explained to Deputy Freeman that he drank about 24 ounces of beer when he had dinner at his daughter's home earlier that night. Despite the low PBT result, Deputy Freeman placed defendant under arrest for operating while intoxicated because she believed that defendant exhibited visible signs of impairment. Deputy Vetor conducted an inventory search of defendant's vehicle and found multiple prescription medications in a lunchbox container.

Deputy Freeman transported defendant to the hospital. Defendant refused consent to have his blood drawn, so Deputy Freeman requested a search warrant. In her warrant affidavit, she stated, "I made contact with Steven Highland [who] was in the driver's seat, he admitted to drinking alcohol, Steven did not know his address or what year it was. Steven kept falling asleep while rescue personnel was [sic] trying to speak to him. Steven had the smell of intoxicants coming from his person." A judge authorized the warrant, so the hospital staff performed the blood draw, which was about two hours after the PBT test.

Defendant's blood samples were tested for alcohol and controlled substances but not prescription medication. Ryan Gifford, a qualified expert in forensic science, testified that no alcohol was detected in defendant's blood samples. The test for controlled substances detected amphetamines at "less than ten nanograms per milliliter" and also indicated the presence of an unquantified level of methamphetamine.

Dr. Randall Commissaris, a qualified expert in toxicology and pharmacology, stressed that drug concentration was the primary factor in determining whether a substance affects driving ability. Commissaris explained that both prescription drugs and nonprescription drugs "can turn badly and affect driving performance." Defendant's prescription drugs could each individually affect driving ability in high doses, but defendant was prescribed "at the low end for each of those drugs," and there was no evidence that he took more than he was prescribed. Because defendant

yielded a 0.019% result on the PBT and the toxicology report did not detect alcohol, Commissaris believed that alcohol did not contribute to defendant's behavior at the time of the incident. He also explained that methamphetamine and amphetamine are central nervous system stimulants that would not cause drowsiness or sleepiness. Based on his knowledge of half-lives, he believed that there must have been less than fifteen nanograms per milliliter of amphetamine in defendant's system at the time that the police made contact with defendant. On the basis of his review, Commissaris believed that alcohol, methamphetamine, and amphetamine did not impair defendant's driving performance on the night that he was arrested.

After the close of evidence, the trial court agreed not to instruct the jury regarding any elements of an OWVI that involved alcohol because the prosecutor did not plan to argue that defendant was "guilty because of alcohol in his system." The trial court instructed the jury, in relevant part, as follows:

> The defendant is charged with the crime of operating a motor vehicle while visibly impaired. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt: First, that the defendant operated a motor vehicle. To *operate* means to drive or have actual physical control of the vehicle. Second, that the defendant operated the vehicle on a highway or other place open to the public or generally accessible to motor vehicles including any designated parking area. Third, that, due to the use or consumption of a controlled substance/use or consumption—or use of—or use of an intoxicating substance the defendant drove with less ability than would an ordinary careful driver. The defendant's ability to drive must have been lessened to the point that it would have been noticed by another person. If the defendant's ability to drive that must have [sic] been visibly less—it must have been visibly lessened, not the defendant's manner of driving, though evidence of the defendant's manner of driving may be considered as evidence of the defendant's ability to drive.

> * * *

> Intoxicating substance means a substance, preparation or a combination of substances in preparation other than alcohol or a controlled substance and is either of the following—that is either of the following recognized as a drug in any of the following publications or their supplements. The United States, the Official United States Pharmacopeia, the Official Homeopathic Pharmacopeia of the United States or the official National Formulary.

The trial court did not provide an instruction on the definition of "controlled substance." The jury returned a guilty verdict, and the trial court sentenced defendant, as stated earlier. Defendant now appeals, arguing that the prosecutor failed to present sufficient evidence to support his conviction.

## II. STANDARD OF REVIEW

"We review de novo challenges to the sufficiency of the evidence." *People v Murphy*, 321 Mich App 355, 358; 910 NW2d 374 (2017). "[T]his Court reviews the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Robinson*, 475 Mich 1, 5; 715

NW2d 44 (2006). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Murphy*, 321 Mich App at 359 (quotation marks and citation omitted). "This standard of review is deferential to the fact-finder that weighed the evidence to determine the criminal defendant was guilty beyond a reasonable doubt." *People v Prude*, 513 Mich 377, 385; 15 NW3d 249 (2024). "The scope of review is the same whether the evidence is direct or circumstantial." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000).

## III. ANALYSIS

The Michigan Vehicle Code prohibits individuals from operating motor vehicles under certain circumstances. The OWVI statute, MCL 257.625(3), prohibits a person from operating a motor vehicle when, "due to the consumption of alcoholic liquor, a controlled substance, or other intoxicating substance, or a combination of alcoholic liquor, a controlled substance, or other intoxicating substance, the person's ability to operate the vehicle is visibly impaired." To obtain a conviction of OWVI, the prosecutor "must present evidence to establish beyond a reasonable doubt that consumption of [alcoholic liquor, a controlled substance, or other intoxicating substance] weakened or reduced the defendant's ability to drive such that the defendant drove with less ability than would an ordinary, careful, and prudent driver." *People v Mikulen*, 324 Mich App 14, 22; 919 NW2d 454 (2018). The evidence must be "visual or observational in nature" and describe or depict "actions, conduct, characteristics, or movements of the person during the pertinent time period, revealing an impaired ability to operate a vehicle." *Id*. at 24. Unlike the crime of operating a motor vehicle while intoxicated, an OWVI conviction does not require the prosecutor to prove that the defendant "was actually operating his or her vehicle in an impaired or erratic manner." *Id*. Instead, the prosecutor must prove "that the defendant's *ability* to operate the vehicle was visibly impaired by evidence of, for example, the defendant failing a sobriety test, the defendant stumbling out of a vehicle and unable to walk without falling over, or the defendant speaking incoherently or in a confused manner." *Id*.

In this case, sufficient evidence supported defendant's OWVI conviction. Although defendant had no alcohol, a low level of amphetamine, and an unquantified level of methamphetamine in his system when his blood was drawn, the prosecutor presented evidence that defendant was *visibly* intoxicated with testimony describing the witness's impressions of his behavior and body-camera footage depicting defendant as shaky, jittery, extremely drowsy, and unable to comply with basic instructions. Defendant exhibited some behaviors that were consistent with expert testimony regarding the behavioral effects of stimulants such as methamphetamine and amphetamine. Even though defendant's expert witness did not believe that alcohol, methamphetamine, or amphetamine impaired his driving performance, the jury was "free to believe or disbelieve, in whole or in part, any of the evidence presented." *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999).

Defendant also claims that the prosecutor failed to establish that the drugs or substances referred to at trial met the statutory definitions of an intoxicating substance or a controlled substance. An "intoxicating substance" is defined as follows:

> (a) "Intoxicating substance" means any substance, preparation, or a combination of substances and preparations other than alcohol or a controlled substance, that is either of the following:

(i) Recognized as a drug in any of the following publications or their supplements:

(A) The official United States Pharmacopoeia.

(B) The official Homeopathic Pharmacopoeia of the United States.

(C) The official National Formulary.

(ii) A substance, other than food, taken into a person's body, including, but not limited to, vapors of fumes, that is used in a manner or for a purpose for which it was not intended, and that may result in a condition of intoxication. [MCL 257.625(25)(a)(*i*) and (a)(*ii*).[1]]

The Motor Vehicle Code adopts the Public Health Code's definition of "controlled substance." MCL 257.8b. The Public Health Code defines "controlled substance" as "a drug, substance, or immediate precursor included in schedules 1 to 5 of part 72" of the code. MCL 333.7104(3). This includes any drugs classified as a controlled substance under an administrative rule. *Bloomfield Twp v Kane*, 302 Mich App 170, 183-184; 839 NW2d 505 (2013). Methamphetamine and amphetamine are listed as Schedule II controlled substances. MCL 333.7214(c)(*i*) and (*ii*).

MCL 257.625(3) specifically notes that the intoxication may be "due to the consumption of" one or any "combination of alcoholic liquor, a controlled substance, or other intoxicating substance . . . ." Therefore, the prosecutor must prove that defendant consumed at least one of those listed substances and that the consumption visibly impaired his ability to drive. But this case is unique because the trial court removed "alcoholic liquor" from its jury instructions. For the jury to find that the essential elements of the crime (as represented by the trial court) were proven beyond a reasonable doubt, the prosecutor had to present evidence that defendant consumed something that satisfied the definition of "controlled substance" or "intoxicating substance."

The prosecutor admitted the toxicology report that identified methamphetamine and amphetamine in defendant's blood. Deputy Freeman testified that this report related to testing for controlled substances. Mr. Gifford, the forensic scientist, testified about the results of the report and the identified presence of both amphetamine and methamphetamine in defendant's blood. He described the test as an "LCDOA," which "stands for Liquid Chromatography Drugs and Abuse" and which tests for "drugs of abuse." Many of defendant's behaviors were also consistent with the use of methamphetamine or amphetamine.

Although defendant argues on appeal that the prosecutor failed to present any evidence about whether methamphetamine and amphetamine are classified as controlled substances, he did not dispute at trial, nor could he have,[2] that amphetamine and methamphetamine are both classified

---

[1] The trial court did not instruct the jury on the definition under MCL 257.625(a)(*ii*) because it determined that there was insufficient evidence to support a jury instruction on that definition.

[2] See MCL 333.7214(c)(*i*) and (*ii*).

as "controlled substances." He also did not challenge the evidence that the toxicology report related to testing for controlled substances. Defendant instead presented a defense focused on challenging whether those substances were of sufficient concentration in defendant's blood to have impaired his ability to operate a motor vehicle. Indeed, defendant's expert, Dr. Commissaris, acknowledged that methamphetamine and amphetamine are "stina stimulant drugs," like cocaine, that affect the central nervous system and that are subject to abuse and illegal use:

> But basically methamphetamine and amphetamine like cocaine are CNS stimulant compounds, central nervous system stimulant compounds. They are useful in medical practice, but they also have powerfully rewarding affects [sic]. And some individuals will use them illegally and you can recreationally, you can it call it drug abuse, when you get to the point where it interferes with their life and things like that. They are rewarded, they are, but they are stina stimulant drugs which basically means when you're under the influence of those drugs, when an individual is under the influence of those drugs they're probably going to see evidence of, at high doses there's a risk of death from convulsions. There's a death, a risk of death from cardiac arrhythmias, heart attack, there's also a strong risk of becoming an addict and ending up having been drugged sort of rule your life so to speak.

All of this supports the jury's finding that defendant consumed a controlled substance. Taken in the light most favorable to the prosecutor, we conclude that there was sufficient evidence for the jury to find that defendant's driving ability was impaired by his consumption of a controlled substance or an intoxicating substance, and to find defendant guilty of OWVI beyond a reasonable doubt.

Affirmed.

/s/ Christopher M. Trebilcock
/s/ Mark T. Boonstra
/s/ Anica Letica