*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LANISHA SHARITA WILLIAMS,

Defendant-Appellant.

UNPUBLISHED
March 09, 2026
2:00 PM

No. 371557
Wayne Circuit Court
LC No. 22-000790-03-FC

Before: MALDONADO, P.J., and M. J. KELLY and TREBILCOCK, JJ.

PER CURIAM.

Defendant, Lanisha Williams, appeals as of right her jury trial convictions of kidnapping, MCL 750.349, extortion, MCL 750.213, and unlawful imprisonment, MCL 750.349b. We affirm for the reasons stated in this opinion.

## I. BASIC FACTS

In November 2021, KB, who was 15 years of age, met 16-year-old ZG via social media. The two made plans to meet and have sex. Consummating that plan, KB went to ZG's house on November 20, 2021, and they had sex together. Thereafter, Williams walked into the room. She yelled and, armed with a fan, began to attack. KB was struck and fled the house, leaving behind several items of personal property, including his Air Pods, house key, a hoodie, and a pair of expensive shoes. KB texted ZG in an attempt to get his property back, but someone messaged back that he was "fuckin' with" his life, that "she don't fucking exist," that he should "[l]ose her number," that he was not getting his "shit back," and to "get over it." He left after realizing that he was not going to see the return of his possessions.

The next morning, KB messaged ZG via social media to ask if she was "okay." She stated that she was but asked why he had stolen her "dad's gun." KB stated that he was confused because he had not taken anything, so he sent a message with two question marks. A few hours later, he received some text messages from ZG's phone, including a photograph of his personal property. KB identified a foot that appeared in the photograph as belonging to Williams. KB arranged via text messages to return to ZG's house to retrieve his belongings. He was told via text that it was not a set up, but, because he was suspicious, he decided to share his location with a friend.

At some point before 5:00 p.m., another one of KB's friends drove him to ZG's house. When they arrived in front of the house, two trucks pulled behind his friend's car so that it could not move backward. A man, whom KB learned was codefendant Anthony Tyler, came out from behind the bushes holding a gun. Tyler came up to the car, put a gun to KB's friend's head, and demanded that KB and his friend exit the vehicle. They complied. Several armed men came out of the trucks, and Tyler instructed KB to go into the house. KB tried to run away, but he stopped when one of the men threatened to shoot him if he did not stop. KB then entered the house at gunpoint. His friend was allowed to leave.

Inside the house, Tyler accused KB of stealing jewelry and guns. KB denied the accusations. Tyler struck KB in the head with the "butt" of his gun, causing him to bleed profusely. He also answered a call from KB's brother. During the call, Tyler stated that KB had stolen guns and jewelry and explained that he needed $1,100 for the items. In a later call with KB's brother and mother, the demand for payment was increased to $2,000. KB's mother made multiple calls to Tyler begging him not to hurt her son and promising to pay the money. During some of the calls, Williams made comments to KB's mother, indicating that KB was stupid, had come over to have sex with ZG, and was now going to "get fucked up over some pussy." She laughed and questioned whether it was "worth it" for him to come "over here trying to keep his dick wet." At some point, Tyler instructed codefendant Deshawn "Boogie" Robinson and other men who were present to "drill" KB. Robinson dragged KB to the basement, where he was viciously beaten by Robinson and the other men until he lost consciousness.

Eventually, KB's mother was able to obtain assistance from the police, who advised her to set up a meeting with Tyler to pay the $2,000 ransom. After the meeting was set up, Williams grabbed KB's phone, obtained the unlock code from him, and did something on his phone. He discovered later that some text messages had been deleted. In the meantime, police officers approached the house and observed Tyler and Robinson on the porch. Robinson went back inside, but Tyler admitted that KB was in his house. A police officer ordered Tyler to release KB, and Tyler complied with that order. KB walked out of the house and was transported to a hospital via ambulance.

Tyler was detained. Williams and ZG were also placed in a police car. Inside the car, Williams asked, "How can they charge us with kidnapping when this nigga broke into my house? Because we didn't let him leave? Because we wanted to call his momma and get our belongings back?" During a later police interrogation, Williams stated that "we're here for the little boy that broke into my house." She claimed that he had stolen approximately $3,000 worth of jewelry from her. She also stated:

> After we called [KB's brother], and [who] was being disrespectful, we were trying to get his mama. All we wanted was his mother to come and pick him up. It wasn't like no hostage situation or none of that. We want you to come get your son so we can get our things back that your son stole.

Williams, Robinson, and Tyler were all charged in connection with the incident. As indicated above, Williams was convicted of kidnapping, extortion, and unlawful imprisonment. She appeals now as of right.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Williams argues that the evidence was insufficient to support her convictions of kidnapping, extortion, and unlawful imprisonment under a theory of aiding and abetting. "This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). "In determining whether sufficient evidence exists to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution, and considers whether there was sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *People v Harris*, 495 Mich 120, 126; 845 NW2d 477 (2014). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of a crime, and it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Walker*, 330 Mich App 378, 382; 948 NW2d 122 (2019) (quotation marks, brackets, and citations omitted).

### B. ANALYSIS

As relevant in this case, "[a] person" is guilty of kidnapping "if he or she knowingly restrains another person with the intent of" holding that person "for ransom or reward." MCL 750.349(1)(a). See also *People v Anderson*, 331 Mich App 552, 562; 953 NW2d 451 (2020). "Restrain" is statutorily defined as:

> to restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts. [MCL 750.349(2).]

Further, in order to convict a defendant as an aider and abettor,[1] the prosecution must prove:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (quotation marks and citation omitted; alteration in original).]

"Aiding and abetting describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime . . . ." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks and

---

[1] Under MCL 767.39, a person who aids or abets the commission of a crime may be convicted and punished as if that person directly committed the offense.

citation omitted). "Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime." *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999). "The quantum of aid or advice is immaterial as long as it had the effect of inducing the crime." *People v Lawton*, 196 Mich App 341, 352; 492 NW2d 810 (1992). "An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Carines*, 460 Mich at 758.

In this case, there was sufficient evidence presented at trial to demonstrate that Williams was guilty of kidnapping under an aiding-and-abetting theory. First, the prosecution established that a kidnapping was committed. *Robinson*, 475 Mich at 6. Tyler restrained KB's movements by force and threat of force without KB's consent or any legal authority. Tyler's intent to hold KB for ransom can be inferred based upon his demand that KB's mother give him $2,000 to secure KB's release.

The prosecution also presented sufficient evidence to establish that Williams performed acts or gave encouragement that assisted in the commission of the kidnapping. *Id*. Williams argues that she was merely present at the house. However, viewed in the light most favorable to the jury verdict, her actions "had the effect of inducing the crime." *Lawton*, 196 Mich App at 352. The jury could infer that she sent text messages to KB to entice him to come to the house to retrieve his possessions.[2] Moreover, in a phone call with KB's mother, Williams stated, "we got his dumb ass back over here." The jury could infer that this was an admission that Williams assisted in the commission of the kidnapping because it shows that her actions intentionally led to KB's presence outside the house where his freedom and movement were initially restrained and that she was aware of the effects of her actions. Additionally, words can "support, encourage, or incite the commission of a crime . . . ." *Carines*, 460 Mich at 757. Williams assisted and encouraged the kidnapping when she made accusations about KB during the phone conversation with KB's mother. These accusations served to support the kidnapping as they provided additional pressure on KB's mother to pay the ransom.

Lastly, there is sufficient evidence that Williams intended the commission of the kidnapping or had knowledge that Tyler intended its commission at the time that Williams provided him with aid and encouragement. See *Robinson*, 475 Mich at 6. In the police car, Williams questioned why she was arrested by asking, "[b]ecause we didn't let him leave? Because we wanted to call his momma and get our belongings back?" Similarly, in the interrogation, she explained why she and Tyler had contacted KB's mother, "[w]e want you to come get your son so we can get our things back that your son stole." Williams's statements show that she not only was

---

[2] On appeal, Williams challenges what inferences could be drawn from the photograph of KB's belongings because, in another message attributed to her, it was stated that KB would not be getting his belongings back. However, this challenge is related to the weight and credibility of the evidence and, thus, was an issue properly left for the jury to resolve. See *People v Kenny*, 332 Mich App 394, 402-403; 956 NW2d 562 (2020).

an enthusiastic participant in restraining KB, but also that she likewise wanted to restrict KB's freedom and movement until she got her belongings back. This satisfies the requirement that "defendant intended the commission of the crime . . . ." See *id.*

Accordingly, drawing all reasonable inferences and making credibility choices in support of the jury verdict, there was sufficient evidence to justify a rational trier of fact in finding Williams guilty beyond a reasonable doubt of kidnapping under the theory of aiding and abetting.

Williams next argues that the evidence was insufficient to support her conviction of extortion, under a theory of aiding and abetting. "[T]he crime of extortion is complete when a defendant (1) either orally or by a written or printed communication, maliciously threatens (2) to accuse another of any crime or offense, or to injure the person or property or mother, father, spouse or child of another (3) with the intent to extort money or any pecuniary advantage whatever, or with the intent to compel the person threatened to do or refrain from doing any act against his or her will." *Harris*, 495 Mich at 128-129. Here, the prosecution presented sufficient evidence to establish that the crime of extortion was committed. Tyler demanded payment in exchange for KB's safe return to his family members. In doing so, Tyler "orally . . . maliciously threaten[ed] an[] injury to" KB, "with intent thereby to extort money" from KB's mother. MCL 750.213. Thus, the first element required for a conviction of extortion on an aiding and abetting theory is satisfied. See *Robinson*, 475 Mich at 6.

Next, the prosecution presented evidence establishing that Williams performed acts that assisted in the commission of the extortion. *Id.* This assistance came in the form of helping get KB to the house, as described above. Also, Williams participated in the phone calls where Tyler demanded payment and threatened KB. Speaking about KB, Williams stated, "[n]ow he going to get fucked up over some pussy." This statement could reasonably be understood as communicating a threat to KB's safety.

With respect to the third prong, the prosecution presented sufficient evidence to demonstrate that Williams intended the commission of extortion. See *id.* Williams was present when Tyler threatened and harmed KB. Her statements in the police car and interrogation demonstrate that she wanted KB's mother to be fearful for KB's safety so that she could get her "belongings back."

In sum, there was sufficient evidence to justify a rational trier of fact in finding Williams guilty beyond a reasonable doubt of extortion under the theory of aiding and abetting. *Harris*, 495 Mich at 126.

Lastly, Williams argues that the evidence was insufficient to support her conviction of unlawful imprisonment, again under the theory of aiding and abetting. "[T]o be guilty of unlawful imprisonment under MCL 750.349b(1)(b), (1) a defendant must knowingly restrain a person, and (2) the restrained person must be 'secretly confined.' " *People v Railer*, 288 Mich App 213, 217; 792 NW2d 776 (2010). As discussed above related to the kidnapping conviction, restrain "means to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). Secretly confined means either "[t]o keep the confinement of the restrained person a secret," or "[t]o keep the location of the restrained person a secret." MCL 750.349b(3)(b).

The prosecution presented evidence that unlawful imprisonment was committed, which is the first requirement for a conviction of unlawful imprisonment under an aiding and abetting theory. See *Robinson*, 475 Mich at 6. Tyler used a gun to restrain KB. Though Tyler spoke with KB's mother several times, he kept KB's location a secret. Indeed, it was only because KB had shared his location with a friend that he was able to be located. Next, there was evidence of Williams's participation in the unlawful imprisonment. *Id*. Her role was to get KB to the house by sending text messages that promised the return of his possessions and assured him that it was not a set up. In a statement on the phone call with KB's mother, Williams boasted that "we got his dumb ass back over here." Williams's statement demonstrates that she assisted Tyler in restraining KB by luring him to the house. Lastly, there was sufficient evidence to establish that defendant intended the commission of the unlawful imprisonment. *Id*. Williams's statement in the police car allows the jury to infer her state of mind. Specifically, based upon her question as to why she should be charged with kidnapping for refusing to let him leave when all they wanted was to "call his momma and get our belongings back," the jury could infer that Williams was aware that KB was being restrained, that she was involved in restraining him, and that she wanted him to be restrained.

Based upon the foregoing, there was sufficient evidence to justify a rational trier of fact in finding Williams guilty beyond a reasonable doubt of unlawful imprisonment under the theory of aiding and abetting.

Affirmed.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Kelly
/s/ Christopher M. Trebilcock

-6-